**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
COVINGTON DIVISION**

THEODORE JOSEPH ROBERTS, et. al.   :          Case No. 2:20-CV-00054-WOB

      Plaintiffs            :

v.                               :

ROBERT NEACE, et. al.           :

      Defendants          :

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR EMERGENCY MOTION
FOR PRELIMINARY INJUNCTION AND/OR TEMPORARY RESTRAINING ORDER
WITH VERIFIED COMPLAINT AND DECLARATIONS OF THEODORE JOSEPH
ROBERTS, RANDALL DANIEL, SALLY O'BOYLE, STEVEN STANLEY, AND
CARRIE COX, IN SUPPORT**

**I.     INTRODUCTION**

Plaintiffs, by and through Counsel, seek an ***emergency temporary restraining order***,
preserving the status quo and preventing: 1) criminal enforcement being filed against them, and
2) government agents forcing them into quarantine, where there is no evidence that they are sick
or have been exposed to the Coronavirus.  Plaintiffs further seek a preliminary injunction against
the Governor's orders that prohibit them from attending in-person church services, or from
engaging in interstate travel.

The unconstitutional threats faced by Plaintiffs are solely as a result of their free exercise
of their religious beliefs in attending an Easter Sunday service on April 12, 2020, where they
practiced appropriate social distancing.  As the evidence shows, Plaintiffs are the subject of
selective enforcement against their closely held religious beliefs and practices, while other
activities either are not prohibited, or go on unchecked despite being prohibited.  As the Western
District of Kentucky recently noted: "..an American [Governor] criminalized the communal
celebration of Easter."  (TRO Opinion, *On Fire Christian Center, Inc. v. Fischer*, 3:20-CV-264

1

(WDKY April 11, 2020), attached hereto).  "That sentence is one that this Court never expected to see outside the pages of a dystopian novel, or perhaps the pages of *The Onion*."  *Id.*

## II.    FACTS

For believing Christians, Easter Sunday is the holiest day in the Christian calendar. (Declaration, Roberts).   Plaintiffs have the sincerely held religious belief that in-person attendance at church is required, particularly on Easter.  (*Id.*).  Historically, and leading up to the facts in this case, they have routinely attended church.  (*Id.*).

A.  Background of response actions to the COVID-19

On March 19, 2020, in response to COVID-19, the Governor and/or his designees prohibited some, but not all, public gatherings.  *See* Verified Complaint, Exhibit D (the "Mass Gatherings Order").  On the one hand, the "mass gatherings" Order provides that "[a]ll mass gatherings are hereby prohibited."  Further, "[m]ass gatherings" include "any event or convening that brings together groups of individuals, including, but not limited to, community, civic, public, leisure, ***faith-based***, or sporting events; parades; concerts; festivals; conventions; fundraisers; and similar activities."[1]  (emphasis added).  On the other hand, the "mass gatherings" Order then exempts a number of purely secular activities from this definition.  "For the avoidance of doubt, a mass gathering does not include normal operations at airports, bus and train stations, medical facilities, libraries, shopping malls and centers, or other spaces where persons may be in transit. It also does not include typical office environments, factories, or retail or grocery stores where large numbers of people are present, but maintain appropriate social distancing."[2]

---

[1] This Order and definition is probably unconstitutionally vague.  It does not define the number of people, for instance, that constitutes a mass gathering.  The Governor has stated that it applies to 10 or more persons, but the order itself contains no such language.

[2] A *de facto* exception appears to be the Governor's own daily press conference, where reporters and members of the media gather daily in a "do as I say, not as I do" scenario.

On March 22, 2020, the Governor and/or his designees shut down additional "non-life sustaining" retail establishments to in-person traffic, but left other "life sustaining" retail open such as convenience stores selling lottery tickets and six packs of beer.  *See* Verified Complaint, Exhibit E.  On March 23, 2020, the Governor and/or his designees banned most elective medical procedures.  *See* Verified Complaint, Exhibit F.  On March 25, 2020, the Governor and/or his designees shut down additional businesses for in-person work, while leaving others open.  *See* Verified Complaint, Exhibit G.  On March 30, 2020, the Governor and/or his designees banned out of state travel with five exceptions: (i) when required for employment; (ii) to obtain groceries, medicine, or other necessary supplies; (iii)  to seek or obtain care by a licensed healthcare provider; (iv) to provide care for dependents or the elderly or other vulnerable persons; or (v) when required by court order.   *See* Verified Complaint, Exhibit H.  On April 2, 2020, the Governor and/or his designees expanded the Exhibit H Order, which places anyone coming from out of state, subject to exceptions, into quarantine.  *See* Verified Complaint, Exhibit I.  Collectively, Exhibits H and I are known as the "Travel Ban."  Finally, on April 8, 2020, the Governor and/or his designees placed further restrictions on retail establishments that limited shopping to one adult per household (with exceptions such as for households with dependent children).  *See* Verified Complaint, Exhibit J.

Most of the aforementioned executive orders reference K.R.S. Chapter 39A and/or K.R.S. Chapter 214 as authority for their promulgation.  Both of those Chapters contain criminal penalties, such as K.R.S. 39A.990, establishing as a Class A misdemeanor any violations of orders issued under that Chapter, and K.R.S. 220.990, generally establishing as a Class B misdemeanor any violations of orders under that Chapter.  K.R.S. 39A.190 gives police officers

3

authority to "arrest without a warrant any person violating or attempting to violate in the officer's presence any order or administrative regulation made pursuant to" KRS Chapter 39A.[3]

    B.  <u>The Plaintiffs attend church on Easter Sunday, and face threats of criminal prosecution and an order for house arrest, for doing so</u>

On Easter Sunday April 12, 2020, Plaintiffs, TJ Roberts, Randall Daniel, and Sally O'Boyle, attended Easter service at Maryville Baptist Church, in Hillview, Bullitt County Kentucky. (Verified Complaint ¶28; Declaration Roberts). They each did so pursuant to sincerely held religious beliefs that in-person church attendance is required, particularly on Easter Sunday. (Verified Complaint ¶29; Declaration Roberts). While at the service, each ensured appropriate social distancing and took other measures appropriate for the circumstances in accordance with CDC Guidelines.[4] (Verified Complaint ¶30; Declaration Roberts).

Among other things, they each sat at least six feet away from other congregants at the service, wore masks covering their faces, and did not have personal contact with others attending. (Verified Complaint ¶30; Declaration Roberts). At that time, there were between 11 and 50 persons in Bullitt County[5] with a COVID-19 diagnosis, out of a population of 81,676.[6] (Verified Complaint ¶31; Declaration Roberts). In other words, 0.06% of the population had a diagnosis. *Id.*

---

[3] For the avoidance of all doubt, at this time, Plaintiffs are only challenging the "mass gatherings" Order prohibiting in-person church services, and Plaintiff Roberts is challenging the Travel Ban.

[4] https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/index.html (last visited 4/13/2020); https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/guidance-community-faith-organizations.html (last visited 4/13/2020).

[5] https://govstatus.egov.com/kycovid19 (last visited 4/13/2020)

[6] https://www.census.gov/quickfacts/fact/table/bullittcountykentucky,KY/PST045218 (last visited 4/13/2020).

Also. at that time, no one attending the Maryville Baptist Church was diagnosed with COVID-19, including the Plaintiffs, and no evidence exists that anyone with COVID-19 was in attendance at any of the April 12, 2020 Easter services.  (Verified Complaint ¶32; Declaration Roberts).  Church leadership appeared to take the COVID issue seriously, in that they had the choir and other celebrants of the service spaced six feet apart, and it appeared that the church interior had been sanitized prior to the service.  (Declaration Roberts).  When Plaintiffs, TJ Roberts, Randall Daniel, and Sally O'Boyle, exited the service, they found on their windshields the following notice ("Quarantine and Prosecution Notice"), placed there by Kentucky State Troopers:



(Verified Complaint ¶33; Declaration Roberts).

None of the Plaintiffs have displayed any symptoms of COVID-19 disease, and, to the best of their knowledge, none of them have COVID-19 disease.  (Verified Complaint ¶37; Declaration Roberts).  Unless they have a diagnosis of COVID-19, which none of them have, or display symptoms consistent with COVID-19 disease, Plaintiffs refuse to self-quarantine as required by the Quarantine and Prosecution Notice.  (Verified Complaint ¶38; Declaration Roberts).

6

In light of the Quarantine and Prosecution Notice, Plaintiffs, TJ Roberts, Randall Daniel, and Sally O'Boyle, reasonably fear prosecution as they plan to attend further church services. (Verified Complaint ¶39; Declaration Roberts).  Further, all Plaintiffs fear prosecution and/or the equivalent of house arrest with quarantine, in light of that notice.  *Id.*

    C.  <u>The actions against these Plaintiffs and the church was the result of religious targeting and selective enforcement, while other reported mass gathering violations, reported to the government, are not enforced</u>

In his evening briefings on April 10, 2020, the Governor made clear that he was going to target religious services with these notices, apart from other gatherings.  (Verified Complaint ¶34; Declaration Roberts).  Specifically, the Governor spoke about "mass gatherings" but then admits that he is talking about "less than seven churches" statewide.[7]   He also admitted that he has been "focused a lot on an individual church or pastor."  (*Id.* Video, at the 35:44-39:35 mark). He admitted he is sending out enforcers to take and record the license plate number of church attendees and then will force those attendees to quarantine.  *Id.*  Governor Beshear quoted scripture that he claimed supported his position, and claimed that other houses of worship believe the same dogma he does that in-person attendance at religious services is not required. *Id.*  Governor Beshear likewise informed listeners that the prohibition on "mass gatherings" applies to "in-church" services.  *Id.* at 49:39-51:28.  Further, in response to a reporter's questions, he stated that these enforcement activities apply only to the Easter weekend services and church services.  *Id.* at 1:08:00 to 1:08:07.  Based on the activity of the Kentucky State Police on April 12, 2020, the Governor carried out his threat.  *Id.*

---

[7] https://www.youtube.com/watch?v=SJVDhu38S68&feature=youtu.be (last visited 4/16/2020). This statement can be found at between the 35:44-39:35 mark.

Kentucky State Police have solely been dispatched by the Governor, and by those reporting to him and acting at his behest, to harass, charge, intimidate, and threaten the churchgoers from Maryville Baptist Church and other church services, but not to any other "mass gatherings", including, without limitation, the Governor's own public, daily "mass gathering" where he meets with the press.  (Verified Complaint ¶35; Declaration Roberts).

Meanwhile, other mass gatherings reported to the Governor go unenforced.  Two witnesses have provided declarations demonstrating the selective targeting of the Plaintiffs' exercise of their closely held religious beliefs and practices: Pastor Steven Stanley testifies that he has personally observed the EMW Women's Center in Louisville with a packed lobby containing more than 10 persons and without social distancing.  (Declaration Stanley).  Pastor Stanley also testifies that this, too, has been reported to the Governor's COVID-19 reporting line, without any enforcement response.  *Id.*

Second, Carrie Cox, who testifies to her concern over COVID-19 spreading from public gatherings of more than 10 persons at a historical bridge next to her property, and maintained by the Commonwealth.  (Declaration Cox).  Ms. Cox testifies that she has reported these activities to the Governor's COVID-19 reporting line, without any enforcement response.  *Id.*

Among other consequences, the Quarantine and Prosecution Notice requires a self-quarantine of two weeks by, and threatens criminal action against, the occupant of any vehicle found at the church, including each of the Plaintiffs, and anyone in their households.  (Verified Complaint ¶36; Declaration Roberts).  It does so regardless of whether: (i) any Plaintiff has contracted the disease; (ii) there is any particular assessment of the likelihood of contracting the disease from the activity in question; and (iii) any Plaintiffs took the CDC recommended safety precautions so as to make their contracting the disease unlikely.  *Id.*

D.  The Travel Ban

Absent the Travel Ban, Plaintiff TJ Roberts, who resides and lives in Boone County, would temporarily travel to Ohio, in contravention of the Travel Ban, to: (i) conduct unpaid volunteer work all while complying with social distancing requirements; (ii) recreate all while complying with social distancing requirements; (iii)  associate with others in Ohio all while practicing social distancing requirements; (iv) visit Mr. Bruns' office for the purpose of pursuing this lawsuit all while practicing social distancing requirements; and (v) due to the proximity of Plaintiff to the border, take trips to Indiana and/or Ohio for a variety of purposes, including simply to drive through Indiana and/or parts of Ohio to reach other locations in Kentucky, all while practicing social distancing requirements.  (Verified Complaint ¶40; Declaration Roberts). All of the aforementioned activities are currently permitted under Ohio's and Indiana's COVID-19 response actions.  *Id.*

The Travel Ban, the "mass gatherings" Order with its Quarantine and Prosecution Notice, and other executive orders issued by the Governor do not provide a process by which the individual Kentuckian will be notified if they are charged or accused of a violation of the orders, do not provide any mechanism to challenge or appeal any such determinations, and do not provide any process at all to challenge the facts and circumstances of such orders.  (Verified Complaint ¶41; Declaration Roberts).

E.  The Due Process Issues

The Travel Ban, the "mass gatherings" Order with its Quarantine and Prosecution Notice, and other executive orders issued by the Governor do not provide any right or opportunity for the individual Kentuckian to be heard if the individual is ordered to be quarantined, or detained, or otherwise punished for violating the Travel Ban or "mass gatherings" Order.  (Verified

Complaint ¶42; Declaration Roberts).  They also do not provide the individual Kentuckian with a right to be heard by a fair and independent tribunal if the citizen is ordered to be quarantined, or detained, or otherwise punished for violating those orders.  (Verified Complaint ¶43; Declaration Roberts).  The orders provide no right to appeal a quarantine, detention, or punishment. (Verified Complaint ¶44; Declaration Roberts).

The orders do not provide Kentuckians with the right to present evidence, the right to know the evidence opposing them, the right to cross-examine, the opportunity for counsel, or the right to have a record.  (Verified Complaint ¶45; Declaration Roberts).

During the COVID-19 outbreak, Governor Beshear and the other Defendants have actively enforced the Governor's executive orders, including ordering sheriff's deputies to forcibly quarantine at least one Kentuckian who attempted to travel.  (Verified Complaint ¶46; Declaration Roberts).

Upon information and belief, multiple Kentuckians in Louisville have been ordered to wear ankle monitors to ensure their government-imposed quarantine, even though they have not tested positive for COVID-19.  (Verified Complaint ¶47; Declaration Roberts).

On the same day that the Governor instituted the Travel Ban, he also created the "COVID-19 Reporting Hotline" and requested that Kentuckians call it "for complaints about non-compliance with coronavirus mandates."  (Verified Complaint ¶48; Declaration Roberts).

## III.    LAW AND ARGUMENT

### A.  Standard for Granting Temporary Restraining Orders and Preliminary Injunctions

When deciding whether to issue a temporary restraining order or preliminary injunction, the court must consider the following four factors:

(1) Whether the movant has demonstrated a strong likelihood of success on the merits;

(2) Whether the movant would suffer irreparable harm;

(3) Whether issuance would cause substantial harm to others; and

(4) Whether the public interest would be served by issuance.

*Suster v. Marshall*, 149 F.3d 523, 528 (6th Cir. 1998); *Northeast Ohio Coalition for the Homeless v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006).   These "are factors to be balanced, not prerequisites that must be met." *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).

When analyzing a motion for temporary restraining order or preliminary injunction, "the 'likelihood of success' prong is the most important [factor] and often determinative in First Amendment cases." *Jones v. Caruso*, 569 F.3d 258, 277 (6th Cir. 2009); *see also Aristotle Pub. v. Brown*, 61 F. App'x 186, 188 (6th Cir. 2003).  The standards for preliminary injunctions and permanent injunctions are essentially the same, with the exception that for a permanent injunction the plaintiff must show actual success on the merits rather than the likelihood of success.  *ACLU of Ky. v. McCreary County, Ky.*, 607 F.3d 439, 445 (6th Cir. 2010).

With respect to the 'likelihood of success' prong, and because First Amendment rights are at issue, it is the Defendants, not Plaintiffs, who bear the burden of establishing the constitutionality of the challenged legislation.  *U.S. v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 816 (2000).

**B.  Jurisprudential background concerning governmental pandemic responses**

11

In 1905, prior to the advent of the modern incorporation doctrine,[8] the United States Supreme Court decided the case of *Jacobson v. Massachusetts*, 197 U.S. 11 (1905).  Since then, government actors have cited *Jacobson* as the be-all, end-all when it comes to evaluating their conduct in times of health crises.  Their argument is that during such times, government actors possess a virtual "blank check" of authority.  In other words, and in practical effect, the Constitution is suspended.  Not surprisingly, this is a tortured, unsupported reading of *Jacobson* and the Constitution.

*Jacobson* was a vaccination case.  The Supreme Court in *Jacobson* began its analysis by noting that the rights being asserted could not be found in the Constitution's preamble or spirit – such provisions conveying no rights.  *Id.* at 22.  The *Jacobson* Court viewed the case under its then-existing substantive due process clause, which prohibited "unreasonable, arbitrary and oppressive" government enactments.  *Id.* at 26.  It observed that forced vaccination for the benefit of others "was not an unusual nor an unreasonable or arbitrary requirement."  *Id.* at 27. However, even under its then existing jurisprudence, the *Jacobson* Court rejected the "blank check" argument, and stated that the "power of a local community to protect itself against an epidemic threatening the safety of all, might be exercised in particular circumstances and in reference to particular persons in such an arbitrary, unreasonable manner, or might go so far beyond what was reasonably required for the safety of the public, as to authorize or compel the courts to interfere for the protection of such persons."  *Id.* at 28.

More significantly, the *Jacobson* Court cautioned that where state laws or enactments invade the domain of Federal authority and violate rights secured by the Constitution, the Court

---

[8] The First Amendment was incorporated against the states in 1940.  *Cantwell v. Connecticut*, 310 U.S. 296 (1940).

would deem it "to be its duty" to hold such laws invalid. *Id.* at 29. The Court concluded that where there is a "a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution." *Id.* at 31. Recent caselaw from the Sixth Circuit unquestionably supports this clear-eyed understanding of *Jacobson* that constitutional rights are not suspended during public health crises.

Most recently, in *Preterm-Cleveland v. Attorney General of Ohio*, No. 1:19-cv-00360, 2020 U.S. Dist. LEXIS 61221, *5 (S.D. Ohio March 30, 2020) the State of Ohio ordered healthcare providers "to immediately stop performing non-essential and elective surgical abortions" because of the stated need to "prevent[] the spread of contagious or infectious diseases" and "preserv[e PPE] and critical hospital capacity and resources within Ohio." *Id.* The Southern District of Ohio found that the plaintiffs were likely to succeed on the merits of their claim that this prohibition would result in a violation of the constitution. *Id*. at *8.

The State of Ohio immediately appealed and asked the Sixth Circuit to stay the district court's temporary restraining order. The Sixth Circuit dismissed the appeal and declined to stay the order. *Pre-Term Cleveland v. AG of Ohio*, 2020 U.S. App. LEXIS 10859 (6th Cir. 2020). In fact, and only a few days ago and under somewhat similar circumstances as in the present matter, the Western District of Kentucky stated that "even under *Jacobson*, constitutional rights still exist." Temporary Restraining Order, *On Fire Christian Center, Inc. v. Greg Fischer*, No. 3:20-CV-264-JRW, slip op. at 18 (W.D. Ky. Apr. 11, 2020) (attached hereto).

**C.  The First Amendment has been violated**

The First Amendment protects the "free exercise" of religion, and fundamental to this protection is the right to gather and worship. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943) ("The very purpose of a Bill of Rights was to withdraw certain subjects from the

vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts ... [such as the] freedom of worship and assembly."). This protection was incorporated against the states in *Cantwell v. Connecticut*, 310 U.S. 296 (1940). Because of this fundamental protection, "a law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny." *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546 (1993). The requirements to satisfy this scrutiny are so high that the government action will only survive this standard "in rare cases" and the government bears the burden of meeting this exceptionally demanding standard. *Id.*

This fundamental protection applies regardless of how others feel about the wisdom of exercising these rights. "Although the practice of [in-person church service during a COVID-19 outbreak] may seem abhorrent to some, religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection.'" *Id.* at 531, *quoting Thomas v. Review Bd. of Indiana Employment Security Div.*, 450 U.S. 707, 714 (1981).

As the Supreme Court observed in *Hialeah*, "[i]n addressing the constitutional protection for free exercise of religion, our cases establish the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." 508 U.S. 520, 531, *quoting Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872 (1990). "Neutrality and general applicability are interrelated, and, as becomes apparent in this case, failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Id.*

14

However, a law failing to satisfy **both** these requirements <u>must be</u> justified by a compelling governmental interest and <u>must be</u> narrowly tailored to advance that interest.  *Id.*

The *Hialeah* Court began by addressing neutrality.  It noted that "to determine the object of a law, we must begin with its text, for the minimum requirement of neutrality is that a law not discriminate on its face."  *Id.* at 533.   Specifically, "a law lacks facial neutrality if it refers to a religious practice without a secular meaning discernible from the language or context." Id.

Here, the "mass gatherings Order" bans only some secular "mass gatherings," but all faith-based ones.  *See* Verified Complaint, Exhibit D.  As noted, the "mass gatherings" Order initially provides that "[a]ll mass gatherings are hereby prohibited,"  and then goes on to define "[m]ass gatherings" to include "any event or convening that brings together groups of individuals, including, but not limited to, community, civic, public, leisure, **faith-based**, or sporting events; parades; concerts; festivals; conventions; fundraisers; and similar activities." (emphasis added).  So, the calling out of faith-based gatherings here demonstrates the lack of neutrality on its face.  But making the matter even more problematic, and for the avoidance of' any doubt, the only exemption is for a number of purely secular activities.

Specifically, the "mass gatherings" order continues: "[f]or the avoidance of doubt, a mass gathering **does not include** normal operations at airports, bus and train stations, medical facilities, libraries, shopping malls and centers, or other spaces where persons may be in transit. It also does not include typical office environments, factories, or retail or grocery stores where large numbers of people are present, but maintain appropriate social distancing." (emphasis

15

added).[9]  In other words, the plain text of the "mass gatherings" order leaves no doubt it lacks

facial neutrality.  At this point, the Defendants cannot meet their burden of constitutionality.

However, and even if the Defendants could prove facial neutrality (which they cannot),

the Supreme Court observed in *Hialeah*, "[w]e reject the contention … that our inquiry must end

with the text of the laws at issue." *Id.* at 534.  "Facial neutrality is not determinative." *Id.*  The

Free Exercise Clause even "**forbids subtle departures from neutrality**", and "covert

suppression of particular religious beliefs." *Id.* (emphasis added).  "Official action that targets

religious conduct for distinctive treatment cannot be shielded by mere compliance with the

requirement of facial neutrality." *Id.*  "The Court must survey meticulously the circumstances of

governmental categories to eliminate, as it were, religious gerrymanders." *Id.*

So, the Court in *Hialeah* established even in the face of facial neutrality that any under-

inclusivity and/or overbreadth of the challenged legislation is constitutionally significant.  *Id.* at

535-539.  In other words, if crowded conditions are the concern here, the permissibility of such

gatherings at shopping malls, bus and train stations, medical facilities, libraries, and convenience

stores all demonstrate a significant under-inclusivity problem.   These are the same problems the

Court found constitutionally suspect in *Hialeah*.

The *Hialeah* Court next addressed the requirement of general applicability and noted that

the "Free Exercise Clause protect[s] religious observers against unequal treatment." *Id.* at 546.

"The principle that government, in pursuit of legitimate interests, cannot in a selective manner

impose burdens only on conduct motivated by religious belief is essential to the protection of the

---

[9] These *de jure* exceptions are only for secular purposes.  There are no faith-based exceptions.
As noted, there appears to be at least one *de facto* exception as the Governor's own daily press
conference involving reporters and members of the media is a clear example of "do as I say, not
as I do".

rights guaranteed by the Free Exercise Clause." *Id.* Thus, where government restricts conduct protected by the First Amendment (which certainly is case here) but "fails to enact feasible measures to restrict other conduct producing substantial harm or alleged harm of the same sort, the interest given in justification of the restriction is not compelling." *Id.* at 546-547. Here, the requirement of general applicability quite clearly is not met where there are no feasible measures restricting gatherings of 10 or more at those secular establishments exempted from the "mass gatherings" order, but where harm "of the same sort" can quite easily occur.

That the Supreme Court has been consistent in its rigorous protection of religious freedom is beyond doubt. It has observed that "worship in the churches and preaching from the pulpits" occupies "high estate under the First Amendment." *Murdock v. Pennsylvania*, 319 U.S. 105, 108 (1943). It has gone as far as stating that "the exercise of the rights of free speech and free assembly cannot be made a crime." *Id.*

The Sixth Circuit is no less vigilant when it comes to the Free Exercise Clause. It has held that the Free Exercise Clause is "predicated on coercion." *Mozert v. Hawkins Cty. Bd. of Educ.*, 827 F.2d 1058, 1066 (6th Cir. 1987) (*quoting Abington Sch. Dist. v. Schempp,* 374 U.S. 203, 223 (1963)). As such, a litigant suffers an injury to her free exercise rights when the state compels her "to do or refrain from doing an act forbidden or required by one's religion, or to affirm or disavow a belief forbidden or required by one's religion." *Id.*

So, even if the challenged orders were facially neutral and generally applicable (which they are not), it is also not permissible under the First Amendment to target enforcement towards religious groups to the exclusion of other groups. *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018). As in *Masterpiece*, the Governor's enforcement action of sending armed state troopers to an Easter service to place Quarantine and Prosecution

17

Notices on people's windshields, and to not do so at other non-exempt "mass gatherings," demonstrates a Free Exercise violation.  *See, also, Ark Encounter, LLC v. Parkinson*, 152 F. Supp. 3d 880, 908 (EDKY 2016) ("[t]he Free Exercise Clause 'protect[s] religious observers against unequal treatment,' and inequality results when a legislature decides that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation."); *Hartmann v. Stone*, 68 F.3d 973, 978 (6th Cir. 1995) ("the Supreme Court has made it clear that 'neutral' also means that there must be neutrality between religion and non-religion.").

There is simply no doubt where the Sixth Circuit would stand on the facts before this Court.  In *Ward v. Polite*, 667 F.3d 727, 738 (6th Cir. 2002), Mr. Ward encountered the same problem experienced by these Plaintiffs, namely that "the implementation of the policy, permitting secular exemptions but not religious ones and failing to apply the policy in an even-handed, much less a faith-neutral, manner to [Plaintiffs]" violated the Free Exercise Clause.  *Id.* In reaching this holding in a case where the law at issue was facially neutral (unlike here), the Sixth Circuit observed that "[i]f the law appears to be neutral and generally applicable on its face, but in practice is riddled with exemptions or worse is a veiled cover for targeting a belief or a faith-based practice, the law satisfies the First Amendment only if it 'advance[s] interests of the highest order and [is] narrowly tailored in pursuit of those interests." *Id.*

Ultimately, the Sixth Circuit concluded that "at some point, an exception-ridden policy takes on the appearance and reality of a system of individualized exemptions, the antithesis of a neutral strict scrutiny." *Id.*  "A double standard is not a neutral standard." *Id.*  The *Ward* Court favorably cited then Judge Ailto's opinion in *Fraternal Order of Police Newark Lodge No.12 v. City of Newark,* 170 F.3d 359,365-67 (3d Cir. 1999) (Alito, J.) (invalidating a police department

policy that, due to reasons promoting uniformity within the department, barred officers from growing beards because the policy excepted officers who could not shave for medical reasons, but not officers who could not shave for religious reasons).

Here, as was the case in both *City of Newark* and in *Ward,* the "mass gatherings" order is "riddled with exceptions" for secular "mass gatherings," but bans all faith-based "mass gatherings", such as in-person church services.  As such, it violates the Free Exercise Clause. Similarly, the uneven and targeted enforcement carried out by Defendants with state police being dispatched to churches, but not to other locations, as well as the Governor's own damning admissions of targeting at his news conference, is identical to that tackled by the Sixth Circuit in *Ward* and should result in the same outcome as that reached by the Sixth Circuit in that case.

But even facially, the Governor's orders, as was the case in *City of Newark*, permitting only secular "mass gatherings" but banning all faith based "mass gatherings," such as in-person church services, violates the Free Exercise Clause.

The Governor's facially dissimilatory orders and selective enforcement activities against Christian believers violate the First Amendment's Free Exercise Clause.  There is no question they are not narrowly tailored to serve a compelling governmental interest, where some mass gatherings are permitted, with the permitted gatherings just as likely (and perhaps more so) to spread COVID-19 than a in person church service where people adhere to CDC Guidelines. Plaintiffs have established likelihood of success on this claim.

### D.  The fundamental right to travel has been violated

Under binding Supreme Court precedent, the "constitutional right to travel from one State to another" is firmly embedded in this nation's constitutional jurisprudence. *Saenz v. Roe*, 526 U.S. 489, 498 (1999) (citing *U.S. v. Guest*, 383 U.S. 747, 757 (1966)). "The right is so important

19

that it is assertable against private interference as well as governmental action… a virtually unconditional personal right, guaranteed by the Constitution to us all." *Id*. (citing *Shapiro v. Thompson*, 394 U.S. 618, 643 (1969) (Stewart, J. concurring)). "Freedom of movement is basic in our scheme of values." *Id*. (citing *Crandall v. Nevada*, 6. Wall 35, 44 (1868); *Williams v. Fear*, 179 U.S. 270, 274 (1900); *Edwards v. California*, 314 U.S. 160 (1941)). The Court wrote in the 1970s that "the right of interstate travel is virtually unqualified." *Califano v. Aznavorian*, 439 U.S. 170, 176 (1978).

Decades earlier, the Supreme Court in *Kent v. Dulles*, 357 U.S. 116, 125 (1958), was confronted with the constitutional issue involving travel during what was the then emergency of the day: the threat posed by communists. The Secretary of State refused to issue passports to two individuals after questions arose as to whether they were communists.  The United States was involved in a Cold War with the Soviet Union at the time. However, and even in the midst of the crisis of the Cold War, the Supreme Court reversed.  It held that the right to travel is a part of the liberty of which the citizen cannot be deprived without due process of law under the Fifth Amendment. This is because freedom of movement "may be as close to the heart of the individual as the choice of what he eats, or wears, or reads." *Id*. at 126.  The Court contrasted the right of interstate travel with the right of international travel, holding that while **interstate travel was a virtually unqualified right**, the right of international travel could be regulated within the bounds of due process. *Id*.

Later, the Supreme Court decided *Griffin v. Breckenridge*, 403 U.S. 88, 105-06 (1971) in the wake of ongoing racial violence.  In *Griffin*, black citizens of Mississippi sued a group of whites who conspired to assault them while they travelled on the highways. There, the Court held that "[o]ur cases have firmly established that the right of interstate travel is constitutionally

protected, does not necessarily rest on the Fourteenth Amendment, and is assertable against private, as well as governmental, interference." *Id*.

History shows the Supreme Court has been consistent on the right to interstate travel.   In all of these cases, during all of these similarly trying times, Chief Justice Taney's words from his opinion in the Passenger Cases still ring true: "For all the great purposes for which the Federal government was formed, we are one people, with one common country. We are all citizens of the United States; and, as members of the same community, must have the right to pass and repass through every part of it without interruption, as freely as in our own States." *Smith v. Turner*, 48 U.S. 283, 492 (1849) (Taney, C.J., dissenting).

The Governor's Travel Ban violates a fundamental right, and is beyond his authority under the federal constitution.  The ban is not narrowly tailored to serve a compelling governmental interest.

### E.  Procedural Due Process has been violated

Indeed, as if the violation of the Plaintiffs' constitutional right to interstate travel and Free Exercise of religion was not enough, the Governor's Orders do not provide any due process of law to those accused of violating them.  "[T]here can be no doubt that at a minimum [procedural due process] require[s] that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Cent. Hanover Bank & Trust Co*., 339 U.S. 306, 313 (1950). "A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955). The Supreme Court has explained that "in deciding what process constitutionally is due in various contexts, the Court repeatedly has emphasized that 'procedural due process rules are shaped by the risk of error inherent in the truth-finding

process….'" *Carey v. Piphus*, 435 U.S. 247, 259 (1978) (citing *Mathews v. Eldridge*, 424 U.S. 319, 344 (1976)). Moreover, "Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." *BMW of N. Am. v. Gore*, 517 U.S. 559, 574 (1996).

The executive orders in question (the "mass gathering" Order and the Travel Ban) have none of that. They have no means for a detention, quarantine or punishment to be reviewed by a neutral official. If the Governor orders sheriff's deputies stationed outside a Kentuckian's home, or if another elected official orders an ankle monitor strapped to a Kentuckian's ankle, or if a law enforcement officer detains someone falsely accused of crossing the state border based upon an incorrect tip to the "reporting hotline," an accused Kentuckian must at least have the right to be heard before an unbiased tribunal. *See Mullane, supra*. Given the extraordinary power wielded by the government here – the claimed power to deprive people of foundational constitutional rights – additional due process protections are merited. Kentuckians should have the right to present evidence, the right to know the evidence opposing them, the right to cross-examine, the opportunity for counsel, and the right to have a record.  In the most basic sense, these orders violate procedural due process. As such, Plaintiffs have a substantial likelihood of success on their constitutional claims.  Plaintiffs have established likelihood of success on this claim.

### F.  Emergency Relief should be granted

Plaintiffs have been threatened with forced quarantines and criminal prosecution for attending church on Easter Sunday.  A Temporary Restraining Order should be granted preventing these forced quarantines and criminal prosecutions until this matter fully can be heard.

### G.  Irreparable Harm

To the extent that the moving party can establish a likelihood of success on the merits of its constitutional claims, it also has established the possibility of irreparable harm as a result of the deprivation of the claimed free speech rights. *Connection Dist. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (*quoting Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976)). The Supreme Court has repeatedly recognized that the loss of constitutional rights, for even minimal periods of time, "unquestionably constitutes irreparable injury." *Id.* (*quoting Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976)).

The same is true of Equal Protection.  *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) ("Courts have also held that a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights.").  Having demonstrated likelihood of success, Plaintiffs have similarly demonstrated irreparable harm from the enforcement of the unconstitutional statutes – either facially – or as applied.

### H.  Harm to Others

There is simply no harm to others if state and local officials must obey the Constitution. *Mich. Chamber of Commerce v. Land*, 725 F. Supp. 2d 665 (E.D. Mich. 2010).  *See, also, Foster v. Dilger*, 2010 U.S. Dist. LEXIS 95195 (EDKY 2010) (no substantial harm to others, even where registry incurred printing costs, where constitutional rights at stake); *ACLU v. McCreary County*, 96 F. Supp. 2d 679 (ED KY 2000) (no substantial harm to others).

We are fairly certain that Governor Beshear will argue that public health must be protected, that the risk posed by the prohibited activities justifies his restrictions, and, therefore, this matter does present a risk of harm to others.  However, those arguments ring hollow when one considers the many secular exceptions, the lack of any diagnosed cases of COVID-19 at the

Maryville Baptist Church, the low incidence of diagnosed COVID-19 in Bullitt County generally, and the lack of enforcement other than against those attending Easter Sunday church service.

### I.   Public Interest

As for the fourth factor, the public interest always strongly favors the vindication of constitutional rights and the invalidation of any state action which infringes on those rights or chills their confident and unfettered exercise.  *Mich. Chamber of Commerce v. Land*, 725 F. Supp. 2d 665 (E.D. Mich. 2010).  "It is in the public interest not to perpetuate the unconstitutional application of a statute." *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982); *see also G & V Lounge v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1999) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.").

In fact,  the public interest weighs in favor of the vindication of these rights, even in a COVID-19 epidemic, when one considers the many secular exceptions, the lack of any diagnosed cases of COVID-19 at the Maryville Baptist Church, the low incidence of diagnosed COVID-19 in Bullitt County generally, and the lack of enforcement other than against those attending Easter Sunday church service.

## IV.    CONCLUSION

Plaintiffs have demonstrated their entitlement to a temporary restraining order or preliminary injunction.  At a minimum, Plaintiffs have established cause for the immediate setting of a hearing to determine the merits of this matter, and/or a *status quo* order to Defendants to not further their quarantine orders and not to institute prosecutions against these Plaintiffs, pending a ruling on the merits of this matter.

Respectfully submitted,

/s/ Christopher Wiest
Christopher Wiest (KBA 90725)
Chris Wiest, Atty at Law, PLLC
25 Town Center Blvd, Suite 104
Crestview Hills, KY 41017
859/486-6850 (v)
513/257-1895 (c)
859/495-0803 (f)
chris@cwiestlaw.com

/s/Thomas Bruns
Thomas Bruns (KBA 84985)
4750 Ashwood Drive, STE 200
Cincinnati, OH 45241
tbruns@bcvalaw.com
513-312-9890

/s/Robert A. Winter, Jr.
Robert A. Winter, Jr. (KBA #78230)
P.O. Box 175883
Fort Mitchell, KY 41017-5883
(859) 250-3337
robertawinterjr@gmail.com

**Attorney for Plaintiffs**

## CERTIFICATE OF SERVICE

I certify that I have sent a copy of the foregoing to all counsel of record via filing in the Court's CM/ECF system, which provides notice and service of same to each party of record, this _17___ day of April, 2020, and have further sent a copy of same to Counsel for Hon. Andy Beshear by email, to counsel for Hon. Eric Friedlander by email, and to Hon. Robert Neace by email.

/s/ Christopher Wiest
Christopher Wiest (KBA 90725)