## Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
FRANKFORT DIVISION
CASE NUMBER: 3:20-cv-00036

TONY RAMSEK, et al.,        PLAINTIFFS,

vs.

ANDREW BESHEAR, et al.,        DEFENDANTS.


* * * * * * * *
DEPONENT:    STEVEN STACK, M.D.
DATE:        June 10, 2020
* * * * * * * *

LEE ANN GOFF
COURT REPORTER


B a r l o w
Raising the Bar
Reporting & Video Services, LLC
620 Washington Street
Covington, Kentucky 41011
(859) 261-8440

## Page 2

1    The videotaped deposition of STEVEN STACK, M.D.,
2    taken for the purpose of discovery and/or use as
3    evidence in the within action, pursuant to notice,
4    heretofore taken via Zoom, on June 10, 2020, at
5    2:31 p.m., upon oral examination, and to be used in
6    accordance with the Federal Rules of Civil Procedure.
7
8                * * * * * * * *
9                APPEARANCES
10               VIA ZOOM
11
12   REPRESENTING THE PLAINTIFFS:
13   Christopher Wiest, Esq.
     Chris Wiest, Atty at Law, PLLC
14   25 Town Center Boulevard
     Suite 104
15   Crestview Hills, Kentucky 41017
        and
16   Thomas B. Bruns, Esq.
     Bruns, Connell, Vollmar & Armstrong, LLC
17   4750 Ashwood Drive
     Suite 200
18   Cincinnati, Ohio 45241
19   REPRESENTING THE DEFENDANTS:
20   Wesley Duke, Esq.
     Taylor Payne, Esq.
21   Travis Mayo, Esq.
     Laura Tipton, Esq.
22   La Tasha Buckner, Esq.
     General Counsel, Commonwealth of Kentucky
23   700 Capital Avenue
     Suite 118
24   Frankfort, Kentucky 40601
25   ALSO PRESENT: Tina Barlow, Videographer

## Page 3

1                I N D E X
2
3    Examination of STEVEN STACK, MD        Page
4    BY MR. WIEST:                    4
5    BY MR. DUKE:                    82
6    BY MR. WIEST:                    87
7    BY MR. DUKE:                    98
8    BY MR. WIEST:                    98
9
10
11               E X H I B I T S
12
13   Exhibit                    Page
14   Plaintiff's Exhibit Number 1        5
15   Plaintiff's Exhibit Number 2        15
16   Plaintiff's Exhibit Number 6        26
17   Plaintiff's Exhibit Number 7        30
18   Plaintiff's Exhibit Number 8        39
19   Plaintiff's Exhibit Number 9        47
20   Plaintiff's Exhibit Number 10        49
21   Plaintiff's Exhibit Number 11        50
22   Plaintiff's Exhibit Number 12        63
23   Plaintiff's Exhibit Number 13        67
24   Plaintiff's Exhibit Number 14        75
25   Plaintiff's Exhibit Number 15        78

## Page 4

1        STEVEN STACK, M.D.
2    called on behalf of the Plaintiff, after having been
3    first duly sworn, was examined and testified as follows:
4        CROSS-EXAMINATION
5    BY MR. WIEST:
6        Q.   Just real quick, a couple housekeeping
7    matters.  We did enter some stipulations, the Judge
8    did sign off on those.  I've asked the court reporter
9    just to attach those to the record so the record is
10   clean.
11       Good afternoon, Dr. Stack.  My name is Chris
12   Wiest and, along with Tom Bruns, who is also on this
13   call, I represent the plaintiffs in the matter of
14   Ramsey vs. Beshear.  Two quick ground rules, and I'll
15   have a third ground rule for you in a couple minutes,
16   but -- and then we'll begin.
17       If you don't understand a question that I'm
18   asking, just ask me and I'll repeat it or rephrase
19   it.  But if you do answer it, we're going to
20   understand -- or presume that you understood it.  And
21   if you could listen to the question that I've asked
22   and answer it, we will get through this in fairly
23   short order, probably well short of the time that's
24   been allotted.  I do have another ground rule, but
25   I'm going to get into it in a couple minutes after we

1 (Pages 1 to 4)

Page 5

1  do some introductory matters.
2       Your name is Dr. Steven Stack; correct?
3       A.  That's correct.
4       Q.   And you are the current commissioner of
5  public health for the Commonwealth of Kentucky;
6  right?
7       A.  I am.
8       Q.   And your background, as I understand it, is
9  in emergency medicine; right?
10      A.  Correct.
11      Q.   Can the court reporter go ahead and pull up
12 Exhibit 1, please?
13        (Plaintiff's Exhibit Number 1
14       was marked for identification.)
15      MR. WIEST:  All right.  Tina, can you scroll
16 down a little bit or zoom out?  That's blank.  Is it
17 showing for you?
18      COURT REPORTER:  No, it's blank here.
19      MS. BARLOW:  Yeah.
20      MR. WIEST:  This is a problem.  Can you try
21 to pull it up again?  Close it.
22      MS. BARLOW:  I am.
23      MR. WIEST:  Here's what I'm going to do:  I
24 can -- I think I can share a screen on mine.  Why
25 don't we try it that way?

Page 6

1       MS. BARLOW:  Okay.  Can you see this one?
2       MR. WIEST:  Yeah.  That I can see.
3       MS. BARLOW:  Is this okay?  Chris, are you
4  okay with this one?
5       MR. WIEST:  I -- all I see is your list.
6  That's what I see.  Let me try, Tina, and see if it
7  works from my end, if that's okay.
8       MS. BARLOW:  Okay.
9       MR. WIEST:  I'm going to share screen maybe.
10 All right.  Dr. Stack, can you see -- is that
11 showing?
12      THE WITNESS:  Yes.
13      MR. WIEST:  Okay.  That's how we'll do this
14 today then, that's fine.
15 BY MR. WIEST:
16      Q.   This is Exhibit 1, I've premarked it.  It's
17 an outline of the website from the Office of the
18 Commissioner.  Sir, it's got your biography on it.
19 Would you -- you agree with me that that is a fairly
20 accurate summary of your biography?
21      A.   To the extent that it -- for what it shows,
22 yes.
23      Q.   Okay.  And just to be clear, your background
24 is not related to epidemiology or, or virology;
25 right?

Page 7

1       A.  I'm an emergency physician by background and
2  training who has extensive public policy experience
3  and other attributes that are described in that
4  biography and other places.
5       Q.   And I take it that, as an emergency room
6  doctor with your background, emergency room doctors
7  tend to be generalists, they -- they tend to be able
8  to handle whatever presents in the ER; right?
9       A.  Emergency physicians are acute care
10 specialists trained in the treatment of acute injury
11 and illness in an unplanned manner.
12      Q.   Okay.  Have you ever testified in a -- in a
13 deposition before?
14      A.  Yes.  But quite a long time ago and not
15 related to me personally.
16      Q.   Okay.  Were you an expert witness in that
17 deposition?
18      A.  No, I was a fact witness.
19      Q.   Okay.  Doctor, typically when experts give
20 opinions, they do so to a reasonable degree, in this
21 case, of medical certainty.  And I am going to be
22 asking you some -- this is the third ground rule that
23 we didn't get into before:  When I -- I'm going to be
24 asking you some questions that call for an opinion
25 today.  And when I'm doing so and when you answer, if

Page 8

1  you can, I'd like you to give me your opinions to a
2  reasonable degree of medical certainty.  And if you
3  can't do that in response to any question, I'd ask
4  you to let me know that you're not able to do that.
5  Otherwise we're going to presume the default, as you
6  answer, is that you're, you're giving your answers to
7  a reasonable degree of medical certainty; is that
8  fair?
9       A.  Yes.
10      Q.   Okay.  We're going to be speaking today
11 about coronavirus and some of your public health
12 orders.  And I presume that you have not personally
13 conducted any studies in the laboratory or otherwise
14 on coronavirus; right?
15      A.  Correct.
16      Q.   In other words, as you've been formulating
17 recommendations and issuing orders related to the
18 coronavirus, you've been, I'm assuming, relying on
19 the input or studies that have been conducted by
20 others versus laboratory research that you personally
21 have conducted; right?
22      A.  Yes.
23      Q.   Okay.  As you've issued public health orders
24 or you've recommended others to do so related to the
25 coronavirus, would it be fair to say that your

2 (Pages 5 to 8)

## Page 9

1  primary objective is saving the lives of Kentuckians?
2      A.  Yes.
3      Q.  And as you've formulated public health
4  orders, you've issued them because the science and
5  medical studies support them; right?
6      A.  To the extent the science is known and
7  certain at the time.  The science and knowledge of
8  this disease is fast evolving, and so I have to make
9  decisions and recommendations upon my then-current
10  knowledge and understanding available to those who do
11  the job that I do.
12      Q.  And I take it as you've issued orders
13  related to activities or businesses, those have been
14  generated based on your assessment of risks and your
15  assessment of how to best minimize those risks of
16  spreading the coronavirus in terms of a particular
17  activity or a particular business; right?
18      A.  That's a fair statement.
19      Q.  Okay.  And would you agree that if people
20  violate your orders or those issued by the Governor
21  related to the coronavirus, it can lead to deaths?
22      A.  I believe if people choose a path of action
23  other than the ones I've recommended, they may
24  experience elevated risk of, of a bad outcome with
25  respect to their health and well-being.

## Page 10

1      Q.  And a bad outcome could include death;
2  right?
3      A.  That is one possibility.
4      Q.  And I take it that other possibilities are
5  that they contract the coronavirus and they
6  experience symptoms which, you know, as we know,
7  there's a wide variation of symptoms depending on
8  individual patients; right?
9      A.  It could result in hospitalization, critical
10  care intervention in an intensive care unit,
11  mechanical ventilation, collapse of the respiratory
12  and circulatory system, or a number of other possible
13  consequences.
14      Q.  Would you agree with me that death rates are
15  higher in people with certain comorbidity require --
16  or comorbidity issues?
17      MR. DUKE:  I'm going to object to that
18  question -- this is Wesley Duke by the way -- as, as
19  kind of being out -- well, not kind of, but being
20  outside the scope of the order the judge issued in
21  regard to this deposition.  I don't know whether that
22  question has anything to do with the issue of the
23  difference between in-person protests and, and the
24  other activities under mass gatherings.
25      MR. WIEST:  Yeah.  And, and just for the

## Page 11

1  record, I've got to get to the background before I
2  get to the orders.  And all of this is going to lead
3  into questions about the orders, so I'm just laying
4  the groundwork, Counsel.
5      THE WITNESS:  Mr. Wiest, could you repeat
6  the question for me?
7  BY MR. WIEST:
8      Q.  Yeah.  The -- you would agree that death
9  rates and, and negative outcomes are higher in people
10  or groups of people with certain comorbidity issues;
11  right?
12      A.  Yes.
13      Q.  And it's also been higher with certain
14  groups of people that have characteristics that are
15  known, kind of, risk factors for certain groups of
16  people; right?
17      A.  There are both known and unknown risk
18  factors.  To the extent that those are known, yes, we
19  have identified some that elevate your risk.
20      Q.  For instance, economically disadvantaged
21  people have seen higher death rates from coronavirus;
22  right?
23      A.  I wouldn't disagree with that, but I think
24  that the evidence is more clear for certain other
25  characteristics.

## Page 12

1      Q.  And one characteristic, for instance,
2  certain minority groups, including African Americans,
3  have experienced higher death rates related to the
4  coronavirus; right?
5      A.  In Kentucky that is undeniably true.
6      Q.  I think we just talked about this, but
7  there's a lot of emerging science and a number of
8  studies that are coming out almost every day related
9  to the coronavirus; right?
10      A.  There's an enormous volume of research
11  coming available every day, yes.
12      Q.  Would you agree with me, as we look at the
13  research related to the coronavirus, that a
14  meta-analysis is the gold standard in terms of
15  medical research?
16      A.  I would not.
17      Q.  Okay.  Would you agree with me that a study
18  that is not peer reviewed would be the bottom rung of
19  kind of the research studies that are out there
20  related to the coronavirus?
21      A.  I would not -- not offer you an opinion
22  specifically on the relative weighting of the, the
23  various types of research.
24      Q.  Okay.  From what we currently know,
25  COVID-19, the novel coronavirus, is primarily spread

Barlow Reporting & Video Services, LLC
(859) 261-8440

Page 13

1  by droplets from someone coughing, sneezing,
2  speaking, or shouting; right?
3      A.  Yes.
4      Q.  And Doctor, part of that -- I think we
5  should talk about this, but part of that
6  transition -- or transmission is when someone coughs
7  or speaks or sneezes or yells or sings, it projects
8  tiny droplets; right?
9      A.  Yes.
10     Q.  And then someone else, in terms of
11 transmission, would -- would essentially breathe that
12 in; right?
13     A.  It could come in contact with their eyes,
14 their nose, or their mouth, or it could be inhaled
15 into the respiratory tract.  All of those avenues are
16 common ways to receive those respiratory droplets
17 from another person.
18     Q.  And so being closer than six feet, for
19 instance, to someone else would make them more at
20 risk of receiving those droplets; right?
21     A.  The evidence supports that, yes.
22     Q.  And for instance, let me give you another
23 hypothetical.  If I were in the grocery store line
24 and, and waiting to go check out and someone were
25 behind me closer than six feet, but they sneezed or

Page 14

1  coughed into my back or in the back of my head,
2  that's less risky than being, say, face-to-face;
3  right?
4      A.  There's relative risk.  It depends on the
5  nature of the person who is standing near you,
6  whether they have infection or not, whether they have
7  a high viral load or not.  So there's a number of
8  different variables that, that determine the specific
9  risk in a moment of time.  To, to answer the general
10 question, any time that you are within proximity of
11 someone whose respiratory droplets can reach your
12 eyes, your nose, your mouth, or you can inhale them,
13 your risk of containing -- or contracting an
14 infection is elevated.
15     Q.  Is there more risk being face-to-face versus
16 my face to the back of someone's head?
17     A.  Again, it depends.  There -- whether you
18 are -- it depends on the environments and where you
19 are.  If you are face-to-face and you cough directly
20 at someone, that is a particularly high-risk
21 exposure.  If you are standing in front of someone
22 who has a high viral load and they cough, those
23 droplets can become aerosolized, suspended in the
24 air, and inhaled, and you can still have significant
25 risk.

Page 15

1      Q.  Okay.  Doctor, there are some studies -- I
2  think there's something that just came out this week.
3  Are you aware of any research that suggests that
4  asymptomatic people are far less risky to spread the
5  coronavirus?
6      A.  No.  The jury is still out on that one,
7  quite literally.  There was some misunderstanding
8  from the World Health Organization earlier this week
9  that they have since stepped back from.  A New
10 England Journal article as recently as last week
11 raised the concern about asymptomatic spread and
12 perhaps that they could be as high as 40 percent of
13 cases.
14     Q.  Okay.  There are some other studies that
15 suggest that asymptomatic people are not as risky to
16 spread the coronavirus.  Are you aware of any of
17 those?
18     A.  As you've stated before and we established,
19 there's an incredible volume of research being
20 published daily, not all of which agrees with each
21 other.  And I am aware of various opinions related to
22 the likelihood, or lack thereof, of asymptomatic
23 transmission of this disease.
24     (Plaintiff's Exhibit Number 2
25      was marked for identification.)

Page 16

1      Q.  Okay.  Have you -- and I've just marked and
2  I've just shown you the first page of an exhibit,
3  it's Exhibit 2, related to asymptomatic spread of
4  coronavirus.  Have you seen this before?
5      MR. DUKE:  Mr. Wiest, we can't see that.
6      MR. BRUNS:  Chris, we still have --
7      MR. WIEST:  Let me do this, I think I need
8  to do a new share.  Maybe.  Here it is.
9      MR. DUKE:  Okay.  We have it.
10 BY MR. WIEST:
11     Q.  Have you seen and -- and again, this will be
12 in the record, but have you seen this study about
13 asymptomatic COVID, Doctor?
14     A.  I have not personally reviewed that
15 particular study.
16     Q.  Okay.  Doctor, some of the research that's
17 out there -- and I just want to know whether or not
18 you agree with this:  Is the highest risk for
19 coronavirus transmission through large groups of
20 people that congregate close together in indoor
21 settings?
22     A.  You used superlatives and those are not
23 going to be correct in all settings.  So there is
24 elevated risk for people to be in close proximity to
25 each other.  And when they do so in confined spaces,

4  (Pages 13 to 16)

Page 17

1   because the air doesn't circulate usually as, as much
2   and there could be a higher concentration, there can
3   be elevated risk in an interior setting, so that
4   would be correct.  It is not necessarily the highest
5   risk situation, however.
6       Q.  Okay.  And I know that we've been looking at
7   some statistics.  For coronavirus deaths, as those
8   have been reported, what's being reported are people
9   who, who have passed away with a diagnosis of
10  coronavirus; right?
11      A.  Correct.  If you have a -- if you have a
12  diagnosis of COVID-19 at the time of death, it is
13  felt to be contributory to your cause of death.
14      Q.  Okay.  And unless we do an autopsy on
15  someone, we don't know whether or not coronavirus was
16  merely present or was an actual cause of death;
17  correct?
18      A.  As is often the case, a precise cause of
19  death is a professional medical determination that
20  requires judgment.
21      Q.  Okay.  And unless we do an autopsy, we don't
22  know whether or not coronavirus is an actual cause of
23  death or someone merely passed away with the virus;
24  right?
25      A.  No.  I would say an autopsy is not the

Page 18

1   determining factor.  It's possible with other
2   diagnostic studies such as CT scans, laboratory
3   studies, other radiographs.  It's possible via other
4   diagnostic tools to reach very compelling and more
5   certain diagnoses that don't, therefore, require an
6   autopsy for confirmation.
7       Q.  Okay.  And as, as numbers of corona -- as
8   deaths have been reported related to the coronavirus,
9   would it fair to say that most of the time that level
10  of analysis is not being conducted?
11      A.  It would be fair to say that autopsies are
12  not routinely being conducted, but it is quite common
13  that those other types of studies, CT scans,
14  laboratory studies, radiographs, physical
15  examinations, that those are being done with high
16  frequency related to people who expire from the
17  coronavirus.
18      Q.  And again, what -- the only thing that's
19  being reported though is you have the coronavirus and
20  you passed away; right?
21      A.  The -- in most states, or in all states as I
22  understand it, the cause of death is determined by
23  the treating physician on a death certificate.  And
24  they make their determination at that time based on
25  their best informed judgment and professional

Page 19

1   experience, what the primary cause of death was and
2   what factors contributed to it.  So each treating
3   physician who declares or states a person's death has
4   to determine the causality between those different
5   contributing factors on the death certificate.
6       Q.  Doctor, would you agree with me that the
7   studies in terms of outdoor versus indoor suggest
8   that the risk of coronavirus spread is reduced in
9   outdoor settings?
10      A.  Depending on the nature of the interaction,
11  there is evidence to suggest outdoor settings can be
12  lower risk, all other things being equal.
13      Q.  Okay.  I'm curious -- here's another study
14  that's been out for a little while about the indoor
15  transmission of COVID.  And there are some
16  conclusions that they make that essentially and --
17  you know, I'm looking right here, I'm going to go
18  down to the punch line for you and for me, in which
19  they say that it does not rule out outdoor
20  transmission of the virus, but they suggest that in
21  terms of what they've studied, it is indoor
22  transmission primarily that they're seeing.
23      Have you seen this study before?  And I can
24  go back to the heading if you want to see it.
25      A.  I have not seen that particular study.

Page 20

1       Q.  Are you aware of any studies like it that
2   have reached similar conclusions in terms of risk
3   from outdoor versus indoor?
4       A.  Well, each study is unique.  And the
5   hallmark taught in medical school is the need to read
6   the Materials and Methods section to understand the
7   nature of the design of the study, which I have not
8   had the opportunity to do in this case.
9       Additionally, as I mentioned before, you
10  have to control a number of other variables to make
11  sure they're consistent over time.  So ten people
12  standing 20 feet apart indoors is safer than ten
13  people standing three feet apart outdoors.  In that
14  case I changed the distance between the individuals.
15      Ten people standing in silence next to each
16  other is different than ten people shouting or
17  singing next to each other in the same physical
18  space.  So there are many variables that have to be
19  accounted for, so without accurate time to review
20  this particular study, it would be difficult to
21  determine if I have an opinion on whether I can or
22  can't agree with their conclusions.
23      Q.  There are some studies out there that talk
24  about the wind dispersing the droplets in such a way
25  as to reduce the viral load outdoors.  Do you agree

5 (Pages 17 to 20)

Page 21

1    or disagree with that?
2         A.  In environments where there is more air
3    circulation and it diffuses the concentration of
4    viral particles and respiratory droplets, that would
5    be helpful to further reduce the likelihood of
6    infection, all other things being held equal.
7         Q.  Because the risk of infection does depend in
8    part upon the load, if you will, of the droplets that
9    someone is receiving; right?
10        A.  That is an important contributor, yes.
11           COURT REPORTER:  Hold on one second.
12           MS. BARLOW:  We have a Ms. Buckner that's
13   entering.  Is that okay?
14           MR. WIEST:  Yeah, that's fine.
15           MR. DUKE:  Yes.
16           (Ms. Buckner entered the deposition.)
17   BY MR. WIEST:
18        Q.  And I think you -- you've just acknowledged
19   this, Doctor, but I want to be clear, Harvard Medical
20   put out some guidance that stated, and I'm going to
21   quote it:  Outdoors, air currents are more likely to
22   scatter and dilute the virus, making transmission
23   less likely than in a home, office, or other confined
24   space with limited air circulation.  Do you agree
25   with that?

Page 22

1         A.  I think that's a fair statement, again all
2    the other variables being considered.
3         Q.  I'm going to talk about -- we're going to --
4    we're going to talk about indoor and outdoor
5    gatherings in a minute, the -- but let's talk about
6    indoor first.  The coronavirus doesn't care if the
7    group of people are sitting next to each other in an
8    office conference room or on a church pew if they're
9    engaged in the same activity; right?
10        A.  Yes.
11        Q.  Okay.  And I suppose in some ways -- and I
12   think we've talked about this, but maybe the office
13   conference room could be a little more risky if
14   someone is facing someone else versus a church pew
15   where you're -- where you're facing the back of
16   someone.  Would you agree with that?
17        A.  Again you've given me a good opportunity to
18   explicate why those may or may not be similar risks.
19        Q.  Right.
20        A.  If someone is sitting in a, in a pew and
21   there's a concentration of people, if there's a more
22   dense concentration, the risk could be elevated even
23   if they're not face-to-face.  If the individuals are
24   singing in church, whereas they are silent or just
25   speaking in the office complex, the nature of singing

Page 23

1    and projecting a greater volume over a greater
2    distance, the respiratory droplets could increase the
3    risk of spreading infection.  So again, unfortunately
4    there are many variables.  It depends whether or not
5    they are all similar across the different settings.
6    And, and each situation therefore would have to be
7    analyzed on its own merits.
8         Q.  Okay.  Doctor, the World Health Organization
9    has put out some guidance on social distancing.  And
10   they are suggesting one meter, which is three feet
11   and some change, as appropriate.  I know we've been
12   six feet in the United States and in Kentucky and
13   CDC.  Do you have any opinions about the World Health
14   Organization guidance on the one meter distance?
15        A.  I can offer you my understanding on this.
16   Typically it is felt, at least based on some research
17   done in the past, that in normal conversation
18   respiratory droplets may remain suspended in the air
19   for approximately three feet.  I believe that the CDC
20   added a margin of error to that, so they doubled the
21   distance to increase the likelihood there was a safe
22   distance and lower the risk of disease transmission.
23           In some situations the respiratory droplets
24   can go substantially farther than six feet if you're
25   shouting or screaming or singing loud or any of those

Page 24

1    sorts of -- sneezing or coughing where you have
2    forceful expulsion of air.  So in this case it could
3    well be that the World Health Organization referenced
4    this specific research and that they said that three
5    feet is the distance beyond which it is less likely
6    you get exposed, and that a different public health
7    expert body has determined that adding a margin of
8    safety is in the best interest of public health;
9    hence we arrive at this CDC guidance of six feet,
10   which Kentucky has generally followed.
11        Q.  Doctor, I'm going to take about -- I want to
12   talk about face masks very quickly and then we're
13   going to get into -- because that's in some of these
14   orders and I want to talk about it.  And then we're
15   going to get into some other items and specifics of
16   the orders.  Are you aware of any research that
17   suggests that face masks can actually do more harm
18   than good?
19        A.  Well, the proper use of the face mask is
20   very important.  And the thinking on the face mask
21   has evolved over time.  The current thinking most
22   widely expounded upon for why we advise the use of
23   face masks, it's so that in the event someone has the
24   coronavirus infection and they are coughing or
25   talking or sneezing or laughing, that they don't

Barlow Reporting & Video Services, LLC
(859) 261-8440

Page 25

1   spread it to other people.
2        So it is believed and it is felt that the
3   evidence -- the preponderance of evidence supports
4   that it reduces the transmission of the illness from
5   an infected person to someone else who may not be
6   infected.  As to whether it protects the wearer of
7   the mask themself from receiving infection from
8   others, the evidence is conflicting on how great the
9   value is to the person wearing the mask in protecting
10  them from receiving infection from others.
11       Q.  So said another way, the mask wearing is
12  about protecting the public and not the wearer;
13  right?
14       A.  Predominantly.  There is some -- there's
15  thought to be some benefit.  Obviously in the example
16  you've used multiple times, if you and I are sitting
17  across from each other in close proximity and talking
18  or, or shouting or singing at each other, or one of
19  us sneezes, if I'm wearing a mask, the -- the air and
20  the virus particles could theoretically get around
21  that mask, but it likely is going to catch on the
22  front of the mask the brunt of the respiratory
23  secretions you send my direction.  So it's felt there
24  is some protective value, but it is not the same as
25  the medical grade mask properly worn in a healthcare

Page 26

1   setting.
2        (Plaintiff's Exhibit Number 6
3        was marked for identification.)
4        Q.  Okay.  Let's go -- we're going to look at
5   one quick study.  This is Exhibit 6 maybe.
6        Doctor, have you seen this study?  This is a
7   study on a cluster randomized trial of cloth masks
8   compared with medical masks in healthcare workers.
9   Have you -- have you seen or had the opportunity to
10  see this study before?
11       A.  Not this particular study, sir, no.
12       Q.  Okay.  And if this study were to conclude
13  that the use of cloth masks can actually increase the
14  risk of infection because people don't wash them --
15  they reuse them from day to day without washing them,
16  and people are not disciplined in their use, would
17  you have any reason to disagree with that?
18       A.  Well, I would but, but perhaps not for the
19  reason that you anticipate.  There is certainly a
20  risk that a mask not properly cared for or properly
21  used could expose the user of it or the wearer of it
22  to infection, but it would still have value in
23  keeping a person's contamination to themselves and
24  away from others.
25       And so determining whether the preponderance

Page 27

1   of good or bad, you know, which of the two was more
2   dominant would really depend on the circumstances.
3   So your mask may be very dirty if you wear it, but as
4   long as I stay six feet away from you, and if you
5   cough it is still likely to keep me protected more
6   than if you are not wearing it.  It may not protect
7   you very well though if you don't care for it
8   properly and it picks up debris from other people.
9        Q.  Doctor, I'm going to turn to the context of
10  this case and some of the gatherings, and I want to
11  talk in the context of protests.  In a protest or, or
12  a gathering to protest, there's typically someone
13  talking to the group that's been gathered; right?
14  Someone's using a microphone; right?
15       A.  That's one form of protest, yes.
16       Q.  And then there's people that are gathered
17  around to hear them and possibly to speak or shout
18  back at them; right?
19       A.  Again, that is a common form of protest or
20  gathering.
21       Q.  And just to be clear, the coronavirus does
22  not differentiate based on the content of what is
23  being protested; right?
24       A.  The meaning conveyed by the verbal
25  utterances does not affect the transmission of the

Page 28

1   viral particles.
2        Q.  Okay.  And so if -- whether I'm protesting
3   lockdown orders or I'm marching for Black Lives
4   Matter, the virus makes no distinction in terms of
5   the content of the protests; right?
6        MR. DUKE:  I'm going to object to that.
7   Again, this is Wesley Duke.  And I know we had to lay
8   the background to this, but I think this -- that
9   question and this line of questioning is outside of
10  the scope of the judge's order in regard to the --
11  his direction on why we're here today.
12       THE WITNESS:  Should I proceed on that?
13       MR. DUKE:  Yes, sir.
14       THE WITNESS:  Okay.  So, Mr. Wiest, to your
15  question -- would you repeat that one more time?
16  BY MR. WIEST:
17       Q.  Right.  Whether you're protesting lockdown
18  orders or you're marching for Black Lives Matter, the
19  virus makes no distinction on the purpose of the
20  protest; right?
21       A.  The purpose of the communication or, or the
22  verbal utterances does not have bearing on the risk
23  of transmission of the disease.
24       Q.  If, if people are protesting and they stand
25  about six feet apart and they wear masks and the

7 (Pages 25 to 28)

Page 29

1    protest is outdoors, is that more or less risky than
2    sitting in a church pew six feet -- six feet apart
3    from the next family singing?
4        A.  Well, you've -- you've controlled the
5    variables.  So if people adhere to those variables,
6    meaning that they all stay six feet apart, that they
7    all keep their masks on at all times, if they engage
8    in similar behavior, the activities could in many
9    ways be similar.  Where they are not similar
10   necessarily is most churches don't have the capacity
11   to hold the number of people that could gather in an
12   outside space.  And any time you increase the number
13   of people who come together, you increase the
14   probability that infected people come in close
15   proximity with uninfected people, spread the disease,
16   and that they subsequently take that back to, to
17   their homes or to their other communities which may
18   be, you know, disparate.
19       Q.  Does it matter -- is the risk the same if
20   those people that have gathered for the protest stand
21   six feet apart, assuming that they do?
22       A.  Please clarify that.  When you say is it
23   similar, is it similar to what?
24       Q.  Well, I mean -- my, my question is:  If the
25   people at the protest are standing six feet apart

Page 30

1    from each other, if they're wearing masks, does it
2    really matter how many of them gather as long as
3    they're adhering to those protocols?
4        A.  Well, it does because all of these things
5    are risk-reduction strategies, none of them are
6    risk-elimination strategies.  There is no strategy
7    available, other than remaining in complete isolation
8    from each other until we find a prevention,
9    treatment, or cure for this disease, to effectively
10   keep everyone from becoming infected.  So any time
11   people come within proximity to each other, is a risk
12   of transmission of the disease.
13          And the recommendations that I have offered
14   have been ones that are risk-reduction strategies
15   that can lower the likelihood of disease
16   transmission.  And I think in follow-up or conclusion
17   to that, Mr. Wiest, if you bring together 5,000
18   people versus 50 people, the risk of infection
19   increases substantially simply because you have many
20   more people interacting with each other, where the
21   risk and the likelihood of transmitting disease
22   increases as a direct result.
23          (Plaintiff's Exhibit Number 7
24          was marked for identification.)
25       Q.  Doctor, I'm going to look at -- I'm going to

Page 31

1    look at Exhibit 7.  It's the May -- oh, I'm sorry,
2    March 19th, and it was amended on May 9th, gathering
3    ban.  All right.  And I'm sure -- I'm going to just
4    scroll down real quick.  You are familiar with this
5    order because you signed it; right?
6        A.  I am familiar with this order.
7        Q.  And this order says all mass gatherings are
8    banned; right?
9        A.  Yes.
10       Q.  And it goes on to say, "Mass gatherings
11   include any event or convening that brings together
12   groups of individuals, including, but not limited to,
13   community, civic, public, leisure, faith-based, or
14   sporting events; parades; concerts; festivals;
15   conventions; fundraisers; and similar activities";
16   right?
17       A.  You appear to have read that correctly.
18       Q.  And then it goes on to say, "For the
19   avoidance of doubt, a mass gathering does not include
20   normal operations at airports, bus and train
21   stations, medical facilities, libraries, shopping
22   malls and centers, or other spaces where persons may
23   be in transit.  It also does not include typical
24   office environments, factories, or retail or grocery
25   stores where large numbers of people are present, but

Page 32

1    maintain appropriate social distancing"; right?
2        A.  You have reasonably read the next phrase,
3    yes -- its next line, yes.
4        Q.  Let me ask, first of all, what peer-reviewed
5    studies are you aware of that quantify the risk of
6    outdoor transmission versus indoor transmission, all
7    other variables being equal?  Sorry to back up on
8    you, but I needed to pin that down.
9        A.  Repeat that one more time for me, it was --
10       Q.  Yeah.  Are you aware of any peer-reviewed
11   studies that you're relying on that would quantify
12   the risk of outdoor transmission versus indoor
13   transmission, all other variables being equal?
14       A.  Well, I have read studies I don't have in
15   front of me here, but I have read, you know, academic
16   materials that have talked about the differential
17   likelihood of transmission inside, outside and, and
18   across many other factors that could contribute to
19   the spread of infection.  I, I don't have a specific
20   reference to offer you at this time though.
21       Q.  Okay.  Are you aware as you sit here today
22   of any research that exists showing outbreaks related
23   to outdoor activities?
24       A.  The answer is -- the answer is yes.  There
25   have been outbreaks that were related to outdoor

8 (Pages 29 to 32)

Page 33

1  gatherings and outdoor events that have resulted in
2  the transmission.  And I would have no difficulty
3  finding those, though I don't have them in front of
4  me at the moment.
5      Q.  Okay.  I'm going to look -- and Doctor, I am
6  aware that there was an amendment to this order,
7  we're going to scroll down and look at it, this was
8  May 9th, that allowed for -- oh, let me back up.
9         What is the difference in outdoor
10 transmission rates versus indoor?
11     A.  Again, all -- all variables being held
12 equally, the outdoor transmission rate is probably,
13 you know, to some degree lower than the indoor
14 transmission rate because there's more air
15 circulation and other variables such as the sunlight
16 help to lower the risk.  But it does not eliminate
17 the risk.  And again, the nature of the interaction
18 between the people participating in the gathering,
19 whatever the nature of the gathering, also has direct
20 impact on the risk of infection and the spread.
21     Q.  Can -- can you quantify how much lower that
22 risk is outdoors versus indoors?
23     A.  I'm not aware of any, any accurate study
24 that can reasonably quantify that precisely.  But
25 directionally, and in a general sense, you know,

Page 34

1  publications and my understanding of those
2  publications has been that places where there is
3  greater air circulation such as an outdoor
4  environment can be lower risk.
5      Q.  Okay.  I want to -- this May 9th order that
6  allowed for the in-person worship, it did exempt
7  faith-based gatherings from the order, right, and it
8  put some conditions on those; correct?
9      A.  Yes.
10     Q.  And it explicitly carved out drive-in
11 services, right, from the -- from the order?
12     A.  Yes.
13     Q.  And one of the conditions -- and we're going
14 to look at it here in a second -- one of the
15 conditions that was put on worship was -- and by the
16 way, Doctor, we're going to look at some other orders
17 today and I see this a lot in the orders, 33 percent
18 of building occupancy capacity; right?
19     A.  Yes, I see that.  You have highlighted that
20 with the cursor.
21     Q.  Right.  And that is -- and that's for indoor
22 services; right?
23     A.  In this document, yes.
24     Q.  Okay.  Is there any limit on outdoor
25 services in terms of the number of people that can

Page 35

1  attend?
2      A.  Well, at the time that this document was
3  published, any mass gatherings were prohibited.  We
4  had not even excepted gatherings up to ten people at
5  that point.  So the only exceptions were very
6  specific situations and there were specific orders or
7  guidance documents written for those specific
8  situations.
9      Q.  Okay.  But just to be clear, this order on
10 churches does not have any size in the number of
11 people that can attend an outdoor worship service;
12 right?
13     A.  Well, but different criterion apply to the
14 outdoor service.  The outdoor service was a drive-in
15 service where people were in their own vehicles,
16 where they did not exchange items between
17 participants in other vehicles.  So the description
18 of the permissible activity was different in the
19 outdoor environment than it was in the indoor
20 environment.
21     Q.  Right.  Well, we look at -- there's a 33
22 percent of building occupancy capacity.  Do you see
23 that?
24     A.  I do.
25     Q.  There's no similar limit in terms of if

Page 36

1  you're going to hold it in-person,
2  out-of-your-vehicle outdoors, there's no limit on the
3  number of people; right?
4      A.  Because each vehicle contains people from
5  only their household and there was no interaction
6  between the people in the different vehicles, and
7  therefore there was not the same requirement to, to
8  put the same type of physical distancing between the
9  vehicles because the vehicle itself served as the
10 barrier between other households.
11     Q.  No, I understand the vehicle and I want
12 to -- I want to step away from the vehicles and I
13 want to talk -- and I want to step away from the
14 drive-ins.  And I just want to look at, I'm going to
15 hold my church service in an outdoor environment, you
16 know, outdoor benches, amphitheater kind of
17 environment.  There's no limit that this order puts
18 on the number of people that can attend; right?
19     A.  Theoretically, if you have enough outdoor
20 space to contain vehicles that comply with the
21 requirements of an outdoor gathering, then you could
22 have a larger number of people, if that's what you're
23 asking.
24     Q.  Well, Doctor, there's nothing in this order
25 that prohibits or, or restricts people that are

9 (Pages 33 to 36)

Page 37

1    outdoors from, from only doing it in their vehicles;
2    right?
3        A.  Was this the order that happened -- this was
4    the -- can you scroll up to the date on this for me,
5    sir?
6        Q.  Yeah, it was -- well, May 9th, and you can
7    also see the May 9th --
8        A.  Okay.
9        Q.  Yeah.
10       A.  Correct, so yes.  So this order was in
11   response to another court order where we amended the
12   previous guidance.
13       Q.  Right.
14       A.  We -- my advice, my preference would have
15   been at that point where we were still in phase one
16   of our reopening within the Commonwealth of Kentucky,
17   to have gatherings that did not have in-person, in
18   this particular route.  The courts determined that
19   this was to be permitted, and so then we had to
20   adjust our risk reduction guidance in an attempt to
21   reduce the risk as much as we could, permissible with
22   what the courts would allow.  So in this case, that
23   33 percent is an attempt to reduce the density of the
24   people within a confined space in order to further
25   reduce the risk of infection within what the Court

Page 38

1    would permit.
2        Q.  No, and, and Doctor, I'm not quibbling with
3    the 33 percent indoor.  My, my question is actually
4    related to people that are outdoors, that are out of
5    their cars in an outdoor -- what's called an outdoor
6    sanctuary setting.  There is no limit to the number
7    of people under this order that can attend an outdoor
8    worship service out of their cars, the 33 percent is
9    for indoor services only; right?
10       A.  This, this was -- yes.  I mean, this
11   document does not specify interior or exterior
12   gatherings.  This document was written with the
13   understanding that it was addressing people convening
14   within the confines of the church building itself.
15       Q.  Well, Doctor, there's no building occupancy
16   in an outdoor setting.  Building occupancy is for
17   indoor settings; right?
18       A.  I -- I'd accept that.  Yes.  Yes.
19       Q.  Okay.  Let's look at another order.  This
20   was another question that I had.  There is a lot of
21   shoulds; should limit, should ensure.  And in some of
22   your orders there are -- there are musts.  Are
23   shoulds recommendations and musts things that people
24   have to do, or can, can you -- can you elaborate or
25   explain that for me?

Page 39

1        A.  I would say the use of the word must and the
2    use of the word should are -- were used in their
3    commonly understood interpretation, meaning that must
4    is something that we have a high expectation that you
5    comply with, and should is a strong encouragement
6    that this is a behavior that we strongly urge you to
7    take.
8        Q.  Okay.  And if we were going to enforce this
9    against someone, the musts would be the ones that if
10   you did it, you could have your business shut down or
11   -- and, and the shoulds are things you're just really
12   asking people to do because it's the right thing to
13   do and it's the safe thing to do; is that fair?
14       A.  I think in a general sense that that -- that
15   would be correct, that yes, that the musts are the
16   ones that a transgression of are the, are the ones
17   that are more likely to be enforced than the shoulds.
18   And that the shoulds, we would probably use education
19   as a tool to encourage people to follow those
20   behaviors.
21           (Plaintiff's Exhibit Number 8
22           was marked for identification.)
23       Q.  Okay.  I'll put up another one.  This is
24   Exhibit 8.  This is an order that came out May 22nd,
25   2020.  This is another order that I believe you

Page 40

1    signed and Secretary Friedlander signed; right?
2        A.  Yes, sir.
3        Q.  And I want to go down and, and look at
4    restaurants.  And if we look at restaurants, we see
5    again, and this is a theme, the 33 percent of
6    building --
7           MR. DUKE:  I want to go -- I'd like to make
8    an objection here.  This is Wesley Duke again.  This
9    order does not involve mass gatherings, and that's
10   what, once again, the scope of the deposition today
11   is about in-person protests and other mass gatherings
12   currently allowed.  This is a separate order that,
13   that -- that does not involve mass gatherings.
14           MR. WIEST:  Well, if you recall, Counsel,
15   the 6th Circuit directed us to compare and contrast
16   all of these orders in all of these contexts, which,
17   I mean, this is -- this is right on scope.  I
18   understand your objection; we're going to continue.
19   BY MR. WIEST:
20       Q.  Dr. Stack, this is another one, 33 percent
21   of building capacity.  Do you see that?
22       A.  I do.
23       Q.  I take it when we look at building capacity,
24   we know that if we're at capacity it's a very crowded
25   building; right?  If it's filled with people to

10  (Pages 37 to 40)

Page 41

1  capacity; is that fair?
2      A.  I would -- in general terms, yes, I would
3  agree.  It depends how you define to capacity, but
4  yes, in common understanding, I would accept that.
5      Q.  Well, capacity is actually a legally
6  permitted building occupancy; correct?
7      A.  Right.  Now that you've defined that, if
8  you're following the legally defined building
9  capacity, then yes, if it is reaching that capacity
10  it is relatively full, yes.
11      Q.  Right.  And when you're using the term
12  maximum permitted occupancy, you're using the
13  building code understanding of that, or how many
14  people the fire marshal will allow in the building;
15  right?
16      A.  Yes.
17      Q.  And the -- you and Secretary Friedlander and
18  others have made the determination -- by the way, I'm
19  not questioning it at all -- that right now what is
20  okay is a third of that; 33 percent of that capacity
21  is okay in terms of how many people can be there,
22  subject to the requirement that whoever is there, if
23  you're not of the same household, you need to keep
24  six feet apart from, from other households; right?
25      A.  The only -- the only clarification I'd give

Page 42

1  is, I wouldn't say I'm okay with it; I'd say that we
2  permit it because it is necessary as part of a phase
3  one reopening.  Ideally from a public health
4  standpoint, we would like to keep people away from
5  each other so that they don't spread infection, but
6  there are counterbalancing considerations in society.
7  And, and so in this case, attempting to comply with
8  the general nature of guidance that the federal
9  government has afforded us and other states are
10  trying to do, we have allowed 33 percent of the
11  maximum capacity of a building in this case.
12      Q.  Okay.  You would agree that if people are in
13  different vehicles, automobiles, at the drive-in
14  service from different households, there's no risk to
15  a drive-in service, is there?
16      A.  There's very low risk.  I can never say
17  there's no risk, but I'd say it's very low risk.
18      Q.  Okay.  And that's why, for instance, out on
19  the highways if cars are, you know, bumper to bumper
20  in morning traffic going into or out of a city, I
21  mean, there's not really high risk for that activity
22  if people are in separate cars; right?
23      A.  I'd even agree with you that that is low
24  risk.
25      Q.  Okay.  When we look at the dining, and

Page 43

1  that's what we're looking at here, there is some risk
2  to food being prepared; right?
3      A.  Yes.
4      Q.  And there's some risk to serving drinks;
5  right?
6      A.  Yes.
7      Q.  And let me ask, in terms of, you know, food
8  being prepared or serving drinks, is that -- is that
9  more risky or less risky than talking to someone
10  face-to-face?
11      A.  I would say again, my inclination is to be
12  helpful here, but it's also not to have you
13  misunderstand what I intend.  So when someone is
14  talking face-to-face, that is -- particularly when
15  they're not wearing a mask, that is a high-risk event
16  of transmitting COVID-19 if one of the two
17  individuals is infected.
18          It is lower risk, in my assessment, if
19  someone shares an object or -- between each other,
20  because transmission by contact surfaces is a lower
21  risk overall.  But it is not a risk-free exposure,
22  particularly when an infected person touches an
23  object and hands it immediately to another.
24          So in relative terms, handing an object from
25  one person to another is lower risk than talking

Page 44

1  face-to-face between an infected and noninfected
2  person.
3      Q.  We talked before about, you know, people in
4  separate cars being very low risk.  Is that risk,
5  from a public health perspective, an acceptable risk
6  from your standpoint, if it's a very low-risk
7  activity?
8      A.  Mr. Wiest, I'm --
9      Q.  Now --
10      A.  Can you repeat it or rephrase it?  I think I
11  understand it, but if you could repeat it or rephrase
12  it.  I'm trying -- trying to give you an accurate
13  answer to this.  And I want -- I want to be precise
14  in it because it's a good question, but I also want
15  to not have my answer be misunderstood.
16      Q.  Yeah.  At no time has the Governor or you
17  ever issued an order that says no one can drive in
18  automobiles because you might get close to someone
19  else.  And I think, you know, at the heart of that is
20  a recognition that the risk is so low as to be
21  acceptable to allow people to drive in their
22  automobiles on the highway.  Would you agree with
23  that?
24      A.  Well, I would agree that it is a weighted
25  risk-versus-benefit analysis for these different

11 (Pages 41 to 44)

Page 45

1  recommendations.  And in the case of driving in your
2  own automobile, the need for you to get from one
3  place to another to conduct your daily activities is,
4  is obviously important.  And the relative risk
5  counterbalancing that of acquiring infection or
6  spreading it is, is very low.  And so in that case
7  the analysis is not particularly difficult, it is one
8  where the evidence would clearly suggest that
9  driving, using your vehicle, is a reasonable
10  activity, weighing the risk versus the benefit.
11      Q.  And, and to be fair, I -- would you agree
12  with me that when we -- as we go through these
13  orders, there is a cost-benefit that you and perhaps
14  others are performing in all of these orders?  For
15  instance, restaurants, the benefit of having them
16  reopen perhaps from an economic perspective and other
17  perspectives warrants, you know, allowing that to
18  happen, subject to the 33 percent capacity.
19      In other words, as long as people keep under
20  that capacity of 33 percent and you're six feet away
21  from other people, the benefit outweighs the risks.
22  Would you agree?
23      MR. DUKE:  I'm going to object to that
24  question once again on being outside of the scope of
25  the order.

Page 46

1      A.  Okay.  So I -- I would say that in any of
2  these decisions, I -- and when I offer my advice for
3  public health and safety, it is my intention to try
4  to keep people as safe as possible from a very
5  dangerous infection, the likes of which we've not
6  faced in a century.
7      This is an unprecedented challenge, that it
8  is a threat to humanity the world around.  So we've
9  not had this in any of our living memories.  And in
10  that calculus, I am appreciative of and cognizant of
11  the fact that there are very serious costs and
12  consequences that stem from these public health
13  measures.  And, and those are not lost on me in their
14  general sense, and they weigh heavily on me
15  personally as I make these recommendations.
16      In making the recommendations, we are
17  attempting to reduce the risk to a level that
18  protects people as well as we are able while
19  permitting them to engage in these human interactions
20  that are otherwise important in, in their conduct of
21  their daily lives.
22      Q.  Put another way, there -- there is a
23  cost-benefit analysis that you're engaging in as you
24  make these decisions; right?
25      A.  In, in some --

Page 47

1      MR. DUKE:  I'm going to object to that.  I
2  don't know if that's a question; I think that's
3  testimony.
4      I think the question's been asked and
5  answered.
6      A.  Each time I make these recommendations, I
7  try to weigh the pros and the cons, the risks and the
8  benefits, and the relative costs associated.  And
9  recommend in balance what, what I feel is, is the
10  best balance I can achieve for public health safety
11  and, and other considerations.
12      (Plaintiff's Exhibit Number 9
13      was marked for identification.)
14      Q.  Thank you, Doctor.  Let's look at Exhibit 9.
15  This is another order -- I'm going to get it up here
16  in a minute maybe.
17      Doctor, this was an order that you actually
18  issued a little bit before the last one on May 11th.
19  And this was an order that allowed, among other
20  things, office-based businesses -- or maybe it was
21  Secretary Friedlander that issued this.  I think it
22  was.  I don't think you actually signed this, but I
23  want to look just very, very briefly at the
24  office-based setting, if I can get down to it.  There
25  we go.

Page 48

1      This had a restriction on it that provided
2  that not more than 50 percent of the employees be
3  physically present at the office any given day.  Do
4  you see that?
5      A.  I do.
6      Q.  But there was no limit at all in terms of
7  the number of people that could be present in an
8  office setting where it couldn't otherwise be
9  avoided.  And in that case it was the face masks and
10  six feet apart; right?
11      MR. DUKE:  I'm going to object to that.  I
12  will just -- my same objection as before, is that
13  these are not mass gatherings.
14      A.  So in this context, there is not a specific
15  limit described there.  Other documentation in force
16  at this time does describe that gatherings should be
17  kept to ten or fewer people.  So there is other
18  guidance on the Healthy At Work website that
19  describes, for areas where there is not specific
20  description, that ten or less is the gathering max.
21  But in this context, yes, it does say -- and that one
22  bullet does not specifically limit it to any
23  percentage or specific number.  It does, though,
24  require that there be face masks and the six feet
25  distancing between the individuals.

Barlow Reporting & Video Services, LLC
(859) 261-8440

Page 49

```
 1          (Plaintiff's Exhibit Number 10
 2      was marked for identification.)
 3      Q.  Okay.  I want to look at -- we're going to
 4  go look at Exhibit 10.  Doctor, this was the -- I
 5  know you -- I think you may have misspoken because
 6  the, the order allowing ten people or more to -- or
 7  ten or less to gather did not come in until May 20th;
 8  right?
 9      A.  And I think --
10          MR. DUKE:  I think that's --
11      A.  Well -- yeah, I think you're correct.  I
12  mean if that order preceded this, then you're
13  correct.
14      Q.  Okay.  And, and this was the order, and we
15  see it, ten people -- ten people or, or less are
16  allowed under this order; right?
17      A.  Yes.
18      Q.  Let me ask, Doctor, are you aware of any
19  case or study of -- evidence of COVID spreading from
20  the occupants of one car to another?
21      A.  I am not.
22      Q.  Okay.  As we look at this order, I want to
23  go and look at page, go -- we're going to go down and
24  look at page 7, actually.  Get there.  Got it.  Oh,
25  sorry.  There it is.
```

Page 50

```
 1          One of the things that you recommend is to
 2  "hold the gathering outside whenever possible";
 3  right?
 4      A.  Yes.
 5      Q.  And, and the reason -- I think we covered
 6  this -- is because, all other things being equal,
 7  outdoor gatherings are less risky than indoor
 8  gatherings; correct?
 9      A.  Generally, yes.
10      Q.  Okay.  And again, this is the church
11  order -- or the church guidance has not changed,
12  either, since May 9th; is that fair?
13      A.  I don't believe it has.
14      Q.  Okay.
15      A.  I'd have -- I'd have to look.  As you'll
16  appreciate, my memory is, you know, has its limits
17  and there's a lot of activity taking place.
18          (Plaintiff's Exhibit Number 11
19      was marked for identification.)
20      Q.  No, I understand.  And I'm trying -- I think
21  we're going to get you out of this deposition early
22  actually, Doctor, at the rate that we're going, so
23  that's good.
24          I want to look at Exhibit 11 very quickly.
25  Doctor, this was an order that you just issued, just
```

Page 51

```
 1  about a week ago, on June 3rd, 2020.  And I'll show
 2  you -- that's your signature; right?
 3      A.  Yes, sir.
 4      Q.  And I specifically want to go down and look
 5  at auctions; okay?  And one of the things that this
 6  says is if you cannot do it remotely, you have to do
 7  it outside to the greatest extent practicable; right?
 8      A.  Yes.
 9      Q.  And again, the reason for that is, as we've
10  previously established, is that outdoor gatherings
11  are less risky, all other things being equal, than
12  indoor gatherings; right?
13      A.  Yes.
14      Q.  Now, there is a restriction on the number of
15  people, but only if it's done indoors.  And in that
16  case, if it's done indoors, it's 33 percent of the
17  maximum permitted occupancy of the facility; right?
18      A.  Yes.
19      Q.  But for outside, it is six feet away from
20  each other and the auctioneers or staff; right?
21      A.  That's what it says, yes.
22      Q.  Okay.  And when we're looking at outdoor
23  auctions, essentially as many people as they can fit
24  in the space are allowed to attend; right?
25      A.  There is no upward limit stated in this
```

Page 52

```
 1  document.
 2      Q.  Okay.  And in an -- in an auction, the
 3  auctioneer is speaking or yelling to the crowd as
 4  he's soliciting bids; correct?
 5      A.  That's my understanding of an auction,
 6  that's typically done, yes.
 7      Q.  And the crowd is bidding by yelling back
 8  their bids; right?
 9      A.  Or raising a paddle or some other
10  methodology.
11      Q.  Right.  Yet there's no requirement that
12  they -- that they bid silently by paddle; right?
13  They're allowed to yell back at the auctioneer under
14  this order; correct?
15      A.  This document does not specify it, I don't
16  believe.
17      Q.  Okay.  And the staff -- the staff are
18  required -- I'm going to show you it here in a
19  minute.  The staff have to wear face masks or face
20  coverings if they're within six feet of someone else,
21  but there's no requirement that the crowd do so;
22  correct?
23      A.  Well, it states that the auctions may
24  require customers to wear masks, but it does not
25  mandate that the auctions must enforce the customers
```

13 (Pages 49 to 52)

Page 53

1    to wear masks.
2         Q.  And I just want to -- from a COVID risk
3    spreading perspective, there's no difference between
4    100 or, or let's just take a larger number -- 500
5    people at an auction or 500 people at a protest, is
6    there?
7         A.  Well, those activities can be very different
8    from each other.
9         Q.  Well, I'm going to ask you why in a second,
10   but in both cases people are shouting back and forth;
11   right?
12        A.  Well, not to the same extent or in the same
13   nature.
14        Q.  Again, I'm --
15        A.  So I think -- I think that the, the
16   likenesses you're trying to draw, really it depends
17   on the individual activity itself.
18        Q.  You're saying how the protest is conducted
19   or how the auction is conducted; right?
20        A.  Well, correct.  So, you know, as you've
21   talked about the different types of auctions,
22   thinking of a popular movie, Lara Croft:  Tomb
23   Raider, where there's an auction scene right in the
24   movie and they raise paddles and no one speaks except
25   for the auctioneer.  And the auctioneer is not

Page 54

1    shouting, the auctioneer is talking.
2         Q.  Right.
3         A.  So that auction is very different from the
4    type of auction we've already described as one
5    possibility.  Just, just as other auctions or, or
6    protests can take different shapes and forms.
7         Q.  Well, let's look at the worst-case auction
8    that's permitted under your order, Doctor.
9    Worst-case auction, we've got people shouting back
10   and forth at the auctioneer; right?
11        A.  In one -- yeah, in worst-case scenario, I
12   guess you could have the entire attendance of the
13   auction shouting back at the auctioneer.
14        Q.  Right.  And, and in a worst-case protest,
15   you could have the entire protest shouting back and
16   forth, you know, with the protest leader; right?
17        A.  You could.
18        Q.  And in both cases, there may not be a good
19   way to ensure absolutely, perhaps, that, that social
20   distancing be enforced if the crowd is large enough;
21   right?
22        A.  It could be that when you bring together
23   large numbers of people, it can be difficult to
24   enforce rules of any sort.
25        Q.  Right.  And there's no limit under this

Page 55

1    order in terms of the number of people that can
2    attend an outdoor auction; correct?
3         A.  I can't see the whole order, but I'll just
4    say, yes, I -- I don't -- don't believe we specified
5    any upward max.
6         Q.  There's no limit for the amount of time that
7    the outdoor auction can take place; correct?
8         A.  Not in this document, there is not.
9         Q.  All right.  You previously, I think, were
10   going to -- and I want to allow you to answer the
11   question.  How is this worst-case auction with a
12   large crowd any different than a -- than a protest?
13        A.  So I -- again, I will have to give you
14   illustrative examples to demonstrate the various ways
15   they could be different.
16        Q.  Yeah.
17        A.  So --
18        Q.  Yeah, and I want to focus in on the worst
19   case, where people are shouting back and forth in the
20   auction center.
21        A.  I understand.  If you are conducting an
22   auction, you often can have a way to record who's in
23   attendance.  You may sell a ticket, you may know
24   who's present.  You may have a way to identify or
25   locate or follow those people if there's a problem.

Page 56

1    If you are attending an auction, it is an organized
2    event in the sense that generally they can tell you
3    that these are the conditions under which you can
4    participate in the activity.
5         In fact, in this particular order it
6    empowers the the, the organizer of the auction to exclude
7    people from participation if they -- if the auction
8    organizer requires masks and the individuals coming
9    don't choose to wear them, they can exclude those
10   individuals and decline to provide them that
11   activity.
12        That is -- again, it is not that a protest
13   could not be organized in similar fashion, but many
14   protests are not organized in such similar fashion.
15   There generally are not tickets sold, there are not
16   people who are recorded in person as to who is there
17   and who is not.  The, the nature of the activity is,
18   has more informality in people coming and going, and
19   the intensity of passion, even though there are
20   intense auctions I am sure, is frequently not the
21   same across the events.
22        Which makes one event, meaning the auctions,
23   more likely to be amenable to control efforts.  And
24   another event, meaning the, the protest or public
25   expression of opinion and that, that type of venue,

14  (Pages 53 to 56)

Page 57

1    more difficult and less likely to be controlled, or
2    control.
3          I will offer you a different example since
4    I've used a popular movie as one example.  Watching
5    the television coverage just from this past weekend,
6    one can see the intensity of feeling people have
7    when, when expressing themselves in a protest about
8    deeply held beliefs.  And then you can see examples
9    where individuals are embracing police officers with
10   neither person having a mask and close physical
11   contact occurring.  In that setting, even with the
12   best of intentions, the nature of the activity lowers
13   the likelihood of compliance with rules set out in
14   advance.
15        Q.  So as I understand what you're saying -- and
16   I'm going to go back and, and look at this -- there
17   is no requirement that an auction record who was
18   present under your orders; right?
19        A.  Not in this specific order, but if you are
20   going to bid on an item, generally they have a way to
21   identify who you are, because if you successfully
22   secure the bid you have to pay for the bid you've
23   won.
24        Q.  Sure.  That, that is true.  There's nothing
25   that keeps protestors from recording the protest

Page 58

1    itself and, in fact, you would agree in the age of
2    social media that often does, in fact, occur; right?
3        A.  There's no prohibition about people taking
4    attendance at a protest.  I'm not familiar that that
5    is the typical way in which protests are held.  And I
6    -- and I would offer, Mr. Wiest, that the prohibition
7    is against mass gatherings, it's not specifically
8    against protests.  The, the prohibitions have been
9    against people coming together in large volumes where
10   the risk of transmission of disease and infection is
11   markedly elevated.
12        Protests are only one of those forms, and
13   they are certainly not the only form of mass
14   gathering that is prohibited under these orders.
15   These, these other orders that you are showing with
16   me in these guidance documents, if you will, are
17   essentially exceptions to that rule where we are
18   attempting to permit activities that society has
19   expressed its need to engage in in a way that we have
20   tried to mitigate or reduce the risk as best we are
21   able to.
22        And as I no doubt think you've also
23   observed, that the condition continues to change as
24   we acquire more evidence, more scientific
25   understanding, and hopefully have some confidence

Page 59

1    that we are finding ways to control disease spread so
2    that we can permit the public to engage in as many
3    activities as possible with the least necessary risk
4    incurred.
5        Q.  Okay.  Have you made any recommendations to
6    the Governor in terms of permitting protest activity?
7          MR. DUKE:  I'm going to object to that on
8    the grounds of executive privilege.
9        A.  Am I still required to answer?
10        I have made recommendations only to the
11   general nature and extent of mass gatherings.  The
12   extent that I have offered specific guidance is
13   embraced in these guidance documents where I have
14   made recommendations or -- and worked with teams of
15   individuals to recommend certain situations where
16   larger numbers of people may gather under these, you
17   know, specified conditions.
18        Q.  And is there anything -- I guess let me ask
19   it a more simple way because this -- I think our
20   judge in the 6th Circuit is going to need the answer
21   to this.  Is there anything in the works to permit
22   protest activities?
23        A.  I don't have any specific guidance on a lot
24   of different types of activities, including protest
25   activities.  The -- to give you the frame of

Page 60

1    reference, we have defined generally May to be the
2    phase one reopening, June to be the phase two.  And,
3    and should we not experience a resurgence of disease
4    or, or overwhelming of the healthcare system, phase
5    three would begin on June 29th, at which point it is
6    our proposal to allow gatherings of up to 50 persons
7    and at which point we have received proposals for
8    various other activities.  And if the proposals
9    fulfill the general nature of the guidance that we've
10   requested, we have, you know, granted acceptance for
11   some of those proposals after, you know, on or after
12   the date of June 29th.
13        Q.  Doctor, you would agree with me that if a
14   protest activity occurs and someone were to encourage
15   the protestors to stand six feet apart and to wear
16   masks unless they're currently speaking, that would
17   be a far safer protest than if people are not doing
18   those activities; right?
19        A.  Well, the only distinction I would give it
20   would be it's safer.  I -- you, you've qualified it
21   with, you know, "far safer."  It would be a -- it
22   would be a safer and a lower-risk environment if they
23   complied with the six feet distancing and the
24   universal mask.
25        Q.  And would it be about on par with handling

Page 61

1  an outdoor auction in which people are speaking and
2  yelling back and forth in the context of conducting
3  an auction?
4      A.  I don't know that I can give you that
5  because again we've, you know, I've tried to explore
6  how those different guide -- those different
7  situations are different, but I would say that to the
8  extent that mass gatherings occur, if people adhere
9  to the six-foot distance in all directions, wearing
10  masks, and also using proper hand hygiene, those --
11  those are considered to be three of the most
12  important measures we can advise to minimize the
13  spread of infection.  I would say the nature of the
14  gathering -- or the purpose of the gathering, let's
15  say that, not the nature.  The purpose of the
16  gathering, to me, is largely immaterial.  It's the
17  nature of the gathering, how people interact with
18  each other at it.
19      Q.  Okay.  Just out of -- just curious.  This is
20  the racetrack provision that was in the same order.
21  And apparently no media, no crowds are permitted
22  currently; right?
23      A.  In the current order, yes.
24      Q.  Okay.  If -- and I'm just -- just curious.
25  If you were to allow that to occur but with

Page 62

1  distancing of six feet between customers, is that any
2  less risky or more risky than, than the auction?
3      A.  Are you talking about if fans were
4  permitted?
5      Q.  Yes, sir.
6      A.  I would state -- and I will give you an
7  example now.  There was a belief that Mardi Gras in
8  February in New Orleans where a million people
9  gathered in a largely outdoor environment was
10  considered to be a high risk for the spread of the
11  disease.  And in 1918 when Philadelphia hosted a
12  parade in the middle of the Spanish influenza
13  epidemic, that has been well substantiated to have
14  been a super-spreading event increasing the risk of
15  transmission of disease.
16      So I would state that my general public
17  health preference would be to not have mass
18  gatherings of any sort for any reason, but that human
19  commerce and social engagements have been
20  counterbalancing pressures that have compelled us to
21  have to permit certain activities that are, while not
22  free of risk, we can try to take steps to recommend
23  interventions that will lower the risk.
24      So whether it be a space -- a space track --
25  I'm sorry -- a racetrack or whether it be an outdoor

Page 63

1  concert or whether it be a protest, for me, the fact
2  that we bring large numbers of people together during
3  a pandemic of -- caused by an infection for which we
4  have no vaccine, no cure, and no effective treatment,
5  are all risks that have to be balanced against the
6  competing benefit society is seeking to obtain from
7  them.  And we will do our best to advise the public
8  about what those risks may or may not be and steps
9  they can take to mitigate those risks as best we and
10  they are able.
11      Q.  So Doctor, I know that you -- I mean your,
12  your business is assessing the risk.  Are you the one
13  who is also making the call on the value of a
14  particular activity or is that something that others
15  are also involved in?
16      A.  I don't think I make a value determination
17  specifically on the activity.  I make a determination
18  about the relevant risk of the activity itself.  And,
19  and then in the decision of these things I make my
20  recommendations, and then others have multisource
21  input from other advisors that have to determine
22  where the relative risk and benefit weighting may
23  lie.
24      (Plaintiff's Exhibit Number 12
25      was marked for identification.)

Page 64

1      Q.  I want to look -- we're going to look at
2  some photos right now.  And I think -- this is
3  Exhibit 12, and we're going to go through a bunch of
4  these.  I will represent to you, although I think
5  you're going to recognize it, that these are a bunch
6  of photos of the Capital area, the lawn -- the lawn
7  area.
8      Doctor, you've been to the Capital; right?
9      A.  A few times.
10      MR. DUKE:  I want to object to the relevance
11  of this line of questioning.  I think it's outside
12  the scope of the order.
13      MR. WIEST:  It's going to be real relevant
14  in two questions.
15      MR. DUKE:  I'll still lodge my objection.
16      MR. WIEST:  No, I understand.
17  BY MR. WIEST:
18      Q.  Doctor, you would agree with me that the
19  Capital itself is a -- there's a lot of open space
20  there; correct?
21      A.  There's a fair amount of grassy, open space
22  at the Capital, yes.
23      Q.  And I will tell you you got on the City of
24  Frankfort's GIS and we were able to measure square
25  feet about the front porch of about 201,851 square

Page 65

```
 1    feet, and the back porch area of 68,946 square feet.
 2         MR. DUKE:  I'll lodge my same objection as
 3    to the relevance of this question and ask that -- I
 4    don't know how Dr. Stack can answer as to --
 5         MR. WIEST:  Well, yeah, I'm going to ask him
 6    a hypothetical based off of it.
 7    BY MR. WIEST:
 8      Q.  But Doctor --
 9         MR. DUKE:  Note my objection.
10      Q.  -- you have no reason to quibble with those
11    square footage calculations; right?
12      A.  I, I don't -- I don't dispute these but then
13    again, I also don't validate them --
14      Q.  No, you --
15      A.  -- so we can use them for the sake of your
16    discussion.
17      Q.  Right.  Would you agree with me that if
18    people were to stand in this 200 -- approximately
19    200,000-square-foot area, spread apart six feet
20    between households with masks on, that we could, you
21    know -- and assuming we could accommodate about a
22    thousand people doing that, is that a high-risk
23    activity or a low-risk activity, Doctor?
24      A.  I would say, as I've said repeatedly
25    already, any time you bring large numbers of people
```

Page 66

```
 1    together during the middle of a pandemic with an
 2    easily spread infection for which we have no
 3    successful intervention, it is a high-risk activity.
 4    There are steps you can take to lower that risk or
 5    mitigate the risk.  In this instance being outdoors
 6    is helpful, the fact that -- if you were to be able
 7    to keep people six feet apart from each other, it's
 8    helpful.
 9         But it's also very possible you've contrived
10    a hypothetical that has no bearing on what the
11    likelihood of reality will be.  In this case, if you
12    bring together people who are passionate, wildly
13    vocalizing on a topic, and moving around in a
14    free-flowing event, it is highly unlikely they will
15    stay in their six-square-foot box.  And so I would
16    say that a mass gathering of any sort remains
17    undesirable in the middle of a pandemic.  In this
18    particular case you are describing an activity that
19    is hypothetically possible but realistically
20    difficult, I think, to provide.
21      Q.  You're saying the risk mitigation measures
22    of keeping people six feet apart may be difficult; is
23    that what -- is that correct?
24      A.  Yes.  And also when you're outdoors that
25    is -- that is helpful for lowering the risk of
```

Page 67

```
 1    transmission of disease, but it is harmful to the
 2    compliance with mask use given the heat of standing
 3    out in the open sun and the discomfort associated
 4    with wearing a mask under those conditions.
 5      Q.  Is sunlight an effective virus killer, do we
 6    know?
 7      A.  There is evidence that ultraviolet radiation
 8    decreases the duration where a virus will -- you
 9    know, for which a virus is alive and, and, you know,
10    infective.  So ultraviolet light is hopefully -- it's
11    felt to be generally helpful in lowering the duration
12    of time the virus will remain viable.
13      Q.  And I take it that this is one of these
14    emerging areas of science that we don't have all the
15    answers on yet?
16      A.  It is, because this particular virus has not
17    been around long enough for all the studies that will
18    be conducted.  But, but in general viruses are less
19    durable, if you will, under the beating sunlight
20    because of the ultraviolet radiation.
21         (Plaintiff's Exhibit Number 13
22          was marked for identification.)
23      Q.  Okay.  We're going to look at another
24    exhibit.  Just issued this order.  This was the June
25    8th order and specifically I am going down to page
```

Page 68

```
 1    14.  Oh, by the way, Doctor, that is your signature
 2    on it; right?
 3      A.  Yes, sir.
 4      Q.  Okay.  All right.  This is the requirement
 5    for libraries, distilleries, zoos, and wineries;
 6    right?
 7         MR. DUKE:  I'd like to lodge my objection
 8    right now as these -- those activities that were just
 9    described are not mass gatherings and, therefore,
10    outside of the scope of the order.
11      Q.  Well, let's talk about that.  Doctor, you
12    would agree a mass gathering is anything that brings
13    together a group of people in a confined area -- over
14    ten people; right?
15      A.  Mr. Wiest, that's an interesting question
16    because the federal guidance documents have described
17    various numbers.  Groups of up to ten, groups of up
18    to 50, and groups of over 250.  And there's this gap
19    between the 50 to 250.  But by any measure, it is
20    felt that a gathering greater than 250 is a large
21    gathering.  Some would call it a mass gathering.
22    Under 250 is still a large gathering.
23         And, and so there is some differences
24    just -- you know, judgment or definition in some of
25    those terms.  But when you bring together groups of
```

17 (Pages 65 to 68)

Page 69

1   people larger than 250, I think most people would
2   consider that a large gathering. And, and quite a
3   few would also label it, in the middle of a pandemic,
4   as a mass gathering, though I recognize outside of a
5   pandemic that is not a terribly large gathering for
6   what people would normally do if there were not a
7   highly contagious pathogen spreading throughout the
8   community.
9       Q.   And, and just to go back to the church
10  requirements of the, of the 33 percent building
11  capacity, we could easily get more than 250 people
12  inside, you know, some of the larger churches;
13  correct?
14      A.   I think that's probably possible, yes.
15      Q.   And looking at the auction environment, we
16  could easily get over 250 people attending an outdoor
17  auction; correct?
18      A.   I can imagine that would not be difficult to
19  achieve in many settings.
20      Q.   And so here we're looking at, for instance,
21  zoos. Let me ask, Doctor: Have you been to the
22  Louisville Zoo?
23      A.   I have not.
24      Q.   Have you been to the Lexington Zoo?
25      A.   Do we have a Lexington Zoo?

Page 70

1       Q.   Well, let me --
2            MR. DUKE:  Hold on.
3       A.   I'm not familiar that we have one.
4       Q.   I've not been there. Let me -- let me just
5   back up. Zoos can fit over 250 people, can they not?
6       A.   I -- yeah, I would believe most public zoos
7   could hold more than 250 people.
8       Q.   Large public libraries can fit over 250
9   people; right?
10      A.   Oh, I've seen libraries that can't, but
11  yeah, there's large -- large public library could
12  hold more than 250 people at its full, allowable
13  capacity, yes.
14      Q.   Right. As the -- some of these others, the
15  Speed Museum, the Kentucky History Center, they can
16  fit over 250, can they not?
17      A.   It should be a matter of fact. I mean I
18  don't -- if they can, they can. If they can't, they
19  can't. I just haven't been to all these places.
20      Q.   Okay. Assuming that they can, the only
21  requirement that we've got is -- and let's go look,
22  it's six feet from households; right? Especially
23  for outdoors.
24      A.   And they still have to follow the healthy
25  work guidance for gatherings of up to ten people.

Page 71

1       Q.   Okay.
2       A.   Which still require the masking, the
3   distancing, the hand hygiene, and, and other --
4   infection screening, I believe.
5       Q.   Right. Okay. And then, you know, if
6   we're -- if we're indoor, you know, obviously what we
7   see indoor, I think -- let me go find it.
8       A.   Mr. Wiest, while you're scrolling -- yeah,
9   stop -- stop right there real quick. And if you'll
10  see, because a number of these businesses have other
11  sub-businesses within them, they're required for
12  where it's relevant to follow the requirements for
13  restaurants or the requirements for retail
14  businesses. So a number of other documents are
15  incorporated by reference that require them for, say,
16  food concessions to adhere to the guidelines for
17  restaurants. So there are a number of layered
18  responsibilities in this guidance document not
19  specifically delineated within the document itself.
20      Q.   Right. And so if they've got a snack bar at
21  the zoo, that snack bar has got to comply with the
22  restaurant requirements. If they've got a gift shop,
23  that's got to comply with the retail requirements;
24  right?
25      A.   Yes, sir.

Page 72

1       Q.   Okay. And I -- and really I'm just looking
2   at the zoo portion of it. Indoor -- if we've got an
3   indoor, now we're back to the 33 percent; correct?
4       A.   In this document. I, I would offer for you,
5   since you've referenced the zoo multiple times, in
6   that instance the zoo offered a detailed plan itself
7   that very specifically identified its property and
8   the measures and steps that it would take.
9       Q.   Okay. The -- let me -- let me ask, Doctor,
10  going back to the protests at the Capital, and I know
11  that the concern -- we talked about a thousand. What
12  if they had 250 people, or what if they had 200
13  people in that 200,000 square feet? Would that be a
14  problem if they were spread out?
15      A.   Well, a much smaller gathering would, would
16  lower the risk if they were spread out, because there
17  -- and again, there's multiple things. And I'm sorry
18  to be repetitious, but in the interest of clarity --
19  but there's the density of the people, there's their
20  compliance with the other interventions, such as
21  not -- you know, not touching each other, and washing
22  their hands, sanitizing their hands, there's wearing
23  the masks.
24           Ideally there's not shouting, chanting,
25  screaming and things like that, because we've shown

18 (Pages 69 to 72)

Page 73

1  in, in -- very clear, repeatedly, the church setting
2  being the most common but there are others, that
3  people in choir practice held together for two and a
4  half hours singing, 87 percent of the people in that
5  choir practice over two and a half hours in Arkansas
6  were infected by COVID-19. So in those instances,
7  obviously there's risk of transmission.
8       And I've already explained, the larger the
9  group, the increased risk that there are more people
10 in that group who may have infection, expose others.
11 And I've used an analogy early in the course of this
12 response where I described it like buckshot where one
13 individual with infection exposes many others. And
14 when they disperse, they scatter and spread
15 infection, you know, to the places they go. But --
16 so in that context any gathering, again, represents a
17 potential risk. But as you described it, it would be
18 considered relatively less risk if you had 20 people
19 versus 200 versus 2,000 versus 20,000.
20     Q. Doctor, if there's a group of people on --
21 let's say it's lunch hour on the streets of
22 Louisville. It gets a little crowded down there
23 around lunch hour, and there's, you know, a thousand
24 people going to or from lunch; is that a risky
25 scenario if they're -- if they're spread out six feet

Page 74

1  apart?
2       MR. DUKE: I'll object. Calls for
3  speculation.
4       A. I would say people freely walking down a
5  city sidewalk close together still represents some
6  risk. But it represents directionally less risk
7  because they're probably not talking or engaging with
8  each other and they're just passing in transit. And
9  so in that case the duration of exposure between any
10 individual is, is low and, and likely to not be
11 particularly intimate or close.
12     Q. Okay.
13     A. I, I would say, Mr. Wiest, that will be -- a
14 different scenario would be standing on a packed
15 subway where people are in a narrow -- a closely
16 confined place with less air circulation and a dark,
17 air-conditioned environment for an extended period of
18 time. That would be the, the other extreme relative
19 or compared to someone passing casually on a crowded
20 street.
21     Q. Okay. And would, would something similar be
22 public transportation on buses in Louisville, to the
23 packed subway?
24     A. Well, I would say public -- they, they face
25 the same challenges.

Page 75

1       Q. Okay. We've not prohibited people from
2  using public transportation during this pandemic;
3  correct?
4       A. I don't think so.
5          (Plaintiff's Exhibit Number 14
6           was marked for identification.)
7       Q. We have a couple more exhibits and, Doctor,
8  I promise you we're going to get you out of here
9  early. I think we're actually going to do that.
10      Let me share this one. Doctor, this is the
11 sports guidance. I realize this is not in effect
12 yet, although it is coming up. Let me ask: The, the
13 children -- one adult per groups of ten or, or less?
14      MR. DUKE: I'll object to the relevance.
15      MR. WIEST: Yeah, it's going to become
16 apparent real quick.
17 BY MR. WIEST:
18      Q. Let me ask, and there's no limit to the
19 number of groups that can -- that can attend that
20 outdoor practice; right?
21      A. Yeah, there's no limit stated here.
22      Q. Part of what goes on at sports practice is
23 the coach yelling; right?
24      A. That can happen at some -- at some sporting
25 events, yes, as far -- yes.

Page 76

1       Q. And, and part of what sometimes happens is,
2  is the student athletes can get kind of loud, too,
3  particularly at a practice; right?
4       A. That's a possibility.
5       Q. We don't limit how -- I realize they've got
6  to be within six feet, but the number of groups,
7  because we allow multiple groups to get together,
8  there's no limit to the number of kids that can
9  attend on a sports field or anything like that;
10 right?
11      A. Well, it says up there, see, when you talk
12 about social distancing, right above your
13 highlighter, the guidelines for groups of ten people
14 or fewer which require -- and that incorporates the
15 social distancing expectation of six feet or more,
16 masking, so that that's all incorporated in that
17 other document.
18      Q. Okay. Yeah, they are -- I know that there
19 is some masking requirements, but not while they're
20 actively practicing; right?
21      A. Right. So when -- when they're out on the
22 field, and for -- for many of these we've had to give
23 the acknowledgment that there are certain
24 circumstances where the counterbalancing risk is not
25 accept -- you know, means you can't do it. So we

Barlow Reporting & Video Services, LLC
(859) 261-8440

Page 77

1    don't want people to be directly harmed wearing a
2    mask. And an instance is where perhaps standing in
3    85-degree heat wearing a mask is certainly -- could
4    represent a safety issue, that then we are not asking
5    people to endanger themselves directly to wear the
6    mask, which is why we have taken steps to try to
7    enforce social distancing as much as possible across
8    as many different settings as we are able.
9        Q.  Okay.  My son wanted me to ask you this:
10   Are we going to have a high school fall football
11   season, Doctor?
12       A.  Can I protest myself and say we're -- calls
13   on speculation?  I --
14       MR. DUKE:  Yeah, I probably -- I'm going to
15   object but you, you can answer.  Obviously I know
16   this is in jest, but --
17       A.  Yeah.  I don't know.  Mr. Wiest, in any of
18   this it is my hope that we can -- our scientists and
19   medical experts will find some kind of vaccine,
20   treatment, or cure that will allow us to get back to
21   our normal activities as quickly as we can with the
22   least loss of human life and suffering possible so
23   that -- it's been very nice to meet you today in this
24   experience, but obviously if we were not in the
25   middle of a pandemic, you and I would not have had

Page 78

1    this opportunity.
2        Q.  I appreciate that, Doctor.  I've got a
3    couple more questions and then I think we're about
4    wrapped up.
5        MR. DUKE:  And I'm going to have a few, few
6    on cross, too, Mr. Wiest.
7        MR. WIEST:  Yeah, that's fine.
8        (Plaintiff's Exhibit Number 15
9        was marked for identification.)
10   BY MR. WIEST:
11       Q.  I'm going to show you what we've marked as
12   Exhibit 15 maybe.  All right.  Dr. Stack, is this
13   activity in violation of the mass gatherings ban,
14   that's depicted in this photo?
15       MR. DUKE:  Objection.  Calls for speculation
16   and relevance.
17       A.  So the collection of people in front there,
18   it is a large collection of -- and a public
19   collection of people that is currently prohibited
20   under the mass gathering guidance, yeah.
21       Q.  Okay.  And I'm going to show you a couple
22   more here in a minute, but is this activity that we
23   see going on in this photo endangering the public?
24       A.  The gathering increases the risk of the
25   spread of the coronavirus.

Page 79

1        Q.  Okay.  Show you just a couple more.
2        A.  And Mr. Wiest, scroll back up as long as
3    you're showing pictures here for me.  One more.
4        Q.  Yeah.
5        A.  One more -- one more, I'm sorry.  This one,
6    yeah.
7        You can visibly see in here an individual to
8    the left pulling his mask down on the left of my
9    screen.
10       Q.  Right.
11       A.  You see another individual to the right of
12   the screen not wearing a mask whatsoever, it doesn't
13   appear, or if it is, it's a bandana around their
14   neck.  You can clearly see they're not within --
15   they're not outside of six feet together.  Now, you
16   can also see others who are wearing a mask and who
17   are at least attempting to comply with that guidance.
18   I think these kinds of gatherings unfortunately are
19   just unpredictable in their nature and, and, you
20   know, that we would do our best to educate the public
21   about the risks and benefits of these types of
22   gatherings and, and then hope that we don't have
23   infection as a result.
24       Q.  No, I understand.  I have one more.  Risky,
25   I take it, for people to be touching each other?

Page 80

1        MR. DUKE:  Objection.  Speculation.
2        A.  Physical contact in the middle of a pandemic
3    is elevated risk.
4        Q.  If -- if the people in this crowd -- and
5    I'll scroll back up.  If, if they were wearing masks
6    and all standing six feet apart, would that be
7    acceptable?
8        A.  I think -- so again, Mr. Wiest, not trying
9    to be difficult, but to answer your question,
10   bringing large numbers of people together in the
11   middle of a respiratory-transmitted pandemic is
12   undesirable even if we try to reduce the risk.  If
13   these people were all to be standing six feet away
14   from each other, wearing masks, standing in the
15   outdoors, that would be a lower-risk gathering, but
16   it would not be a no-risk gathering.
17       And unfortunately, because there's a risk
18   that in such a large gathering there's almost
19   certainly some people who have the infection, in our
20   current knowledge of the state of infection in the
21   State of Kentucky.  There is risk of transmission
22   because we've even seen that highly trained,
23   qualified healthcare professionals have difficulty
24   maintaining personal protective equipment hygiene,
25   just because it's difficult, let alone in the

20  (Pages 77 to 80)

Page 81

1   untrained, lay public.  And so you can lower the
2   risk, which is what we are trying to do.  And you've
3   described one theoretical way it could be lowered,
4   which would be everybody to be masked, six feet apart
5   and all standing six feet apart?
6       Q.  Let me ask you, Doctor, can you quantify
7   that risk, the lowering if people were to be masked
8   and six feet apart?
9       A.  I -- I wish I could.  I -- but I am not sure
10  that there's a mathematical model that would easily
11  allow me to do that.  And I would say that each one
12  of those measures, if you're six feet apart -- and
13  we've already talked that typically we think we spray
14  respiratory particles from our mouth about three
15  feet.  That adds a substantial margin of risk
16  reduction.  Wearing a mask further enhances that.
17  And of course, you know, following those two things
18  alone in a large gathering like this would be
19  particularly helpful.
20      MR. WIEST:  Okay.  Let me make sure -- I
21  think I am -- let me make sure.  I'm making sure Mr.
22  Bruns doesn't have, have anything for me.
23      Tom, you can jump in.  Do you have anything
24  else?
25      MR. BRUNS:  No.

Page 82

1       MR. WIEST:  Okay.  I tender the witness,
2   sir.
3       MR. DUKE:  Could we take about a five or ten
4   minute recess before we go to cross?
5       MR. WIEST:  Yeah, that's fine.
6       MR. DUKE:  Thank you.
7       MR. WIEST:  We'll just all mute.
8       MR. DUKE:  Yeah, and yeah.
9       (Brief recess.)
10      DIRECT EXAMINATION
11  BY MR. DUKE:
12      Q.  Thank you.  Okay.  Dr. Stack, just a few
13  follow-up questions.  Once again for the record, my
14  name is Wesley Duke.  I just want to go back.
15      Now, you -- and I think we've clarified that
16  you're the commissioner of the Kentucky Department of
17  Public Health?
18      A.  I am.
19      Q.  Do you think that in your professional
20  opinion, that the provisions on mass gatherings that
21  were put into place in the March 19th order had a
22  real and substantial relationship to the public
23  health of the Commonwealth?
24      A.  I do.
25      MR. WIEST:  Object to form.

Page 83

1       Q.  Would you like to -- and what did you base
2   this decision on -- these decisions on?
3       A.  That the evidence in the early days of this
4   epidemic and at present show that when people are
5   brought together in densely confined areas, that the
6   risk of spreading the contagion is elevated.  I
7   believe we saw this in Wuhan, China and Lombardy,
8   Italy, also here domestically in New York City.
9       And there were publications from the Centers
10  for Disease Control, the World Health Organization,
11  and others that identified that mass gatherings were
12  felt to be particularly high risk.  And on the basis
13  of my observed experience -- or observing experience
14  in other parts of the world and reading from public
15  health experts in the form of WHO, CDC, and others,
16  it was felt by the public health community and myself
17  that large gatherings of people were particularly
18  high risk for spreading this dangerous infection.
19      Q.  Based on your knowledge of the science as it
20  is evolving, has anything changed that position?
21      A.  I still believe that mass gatherings are
22  elevated risk for spreading infections.
23      Q.  Now, we had talked a lot of about different
24  activity and different actions.  Would you consider a
25  trip to the grocery store to be a mass gathering?

Page 84

1       A.  I do not because the nature of the trip to
2   the grocery store is fundamentally different.  At
3   least in my experience, I have generally gone to the
4   grocery store, selected the items I desired off of
5   the shelf.  Seldom do I speak to anybody during that
6   interaction.  And then I reach the checkout, which is
7   nowadays often a self checkout, though not always,
8   and so I may not interact with other people in any
9   means except to pass them in a transitory nature, you
10  know, walking down an aisle.
11      Q.  And on your -- and from your scientific
12  background and I guess your professional point of
13  view, how would you describe that difference between
14  a transitory experience and a communal experience?
15      A.  So a transitory experience has individuals
16  who are only very briefly or temporarily near each
17  other.  They often don't interact with each other
18  personally or directly.  And I already said this, but
19  just to be clear, it's a brief interaction.  So in --
20  in communal activities, and those could be any shape
21  or form where you're together with a group of people
22  over an extended period of time, you have extended
23  exposure to the same people, which increases the risk
24  if one or more of them have an infection, they may
25  spread it to you.

21 (Pages 81 to 84)

Page 85

1    Q.  If the -- so is it safe to say the more
2  contact there is, the higher the risk of infection of
3  COVID-19?
4    A.  Yes.
5    Q.  And the more -- for example, the more
6  talking between -- or in the vicinity of parties?
7    A.  Yes.  The exposure -- duration of exposure
8  and intensity of exposure are both two different
9  variables.  The duration of exposure is how long you
10  are in the same space or close proximity to someone
11  who has the infection.  The, the intensity of the
12  exposure would be -- you know, kissing someone who
13  has coronavirus would be a particularly high risk way
14  to acquire the infection from someone with it.
15  Talking and shouting and singing, loud
16  vocalizations -- or coughing or sneezing are, are
17  other elevated risks, though clearly not to the same,
18  you know, magnitude as kissing someone.
19    Q.  And those are, I guess to reiterate your
20  earlier testimony that those types of behavior, the
21  yelling, the shouting, the chanting, the singing, are
22  more likely to occur at a protest?
23    A.  Well, I -- I would broaden it.  I would say
24  that they're likely to occur -- more likely to occur
25  in a number of different settings.  Places where

Page 86

1  people come together specifically to sing, I would
2  say are elevated risk.  Where people come together at
3  a protest and they are shouting or chanting or
4  cheering, I would say that that's another situation
5  where there's elevated, you know, risk because you're
6  just -- you're projecting more respiratory droplets
7  with more force and for an extended period of time.
8    Q.  And in your medical opinion -- we talked
9  about, about a trip to the zoo.  Would you
10  characterize that as a transitory experience or a
11  gathering?
12    A.  I would say for the participants in the
13  zoo -- again I have to rely on my own experience, I
14  -- Mr. Wiest, I have been to many zoos in my
15  lifetime, though I have not been to the Louisville
16  Zoo, but I will strive to correct that deficiency
17  since I'm a proud Kentuckian.
18    I would say that you interact with the
19  members of your own household probably fairly
20  significantly as you go through the experience, but
21  that your interaction with most other people, other
22  than the employees where you may buy food at a
23  concession stand or buy materials in a store, that
24  most of those engagements are transitory in -- just
25  in passing in an outdoor space usually, though there

Page 87

1  are clearly indoor exhibits in some of these zoos.
2    Q.  And all of the advice and guidance that you
3  have given during the -- during the pandemic, or
4  since -- or since March 6th, since we've been under a
5  state of emergency, have those all been based on
6  basic public health principles and the science as you
7  know it?
8    A.  Yes.  I, I have used basic public health
9  knowledge and principles.  And, in fact, this is
10  particularly foundational public health in
11  recommending these sorts of nonpharmaceutical
12  interventions, as they call them, which are public
13  health distancing measures.
14    Q.  And none of your decisions have been based
15  on any personal value judgments or anything along
16  those lines?
17    A.  No, sir.  Other than that my, my goal is to
18  try to keep as many people safe as possible from this
19  infection.
20    MR. DUKE:  I think that's all the questions
21  I have.
22    MR. WIEST:  All right.  I've got a few
23  follow-ups.
24    RECROSS-EXAMINATION
25  BY MR. WIEST:

Page 88

1    Q.  Doctor, is a gathering in an office
2  conference room with 25 people a mass gathering?
3    MR. DUKE:  Object to form.
4    A.  Well, not by the definitions I told you,
5  because the, the guidelines that we're describing --
6  again, there, there is a subjective determination in
7  this based on just, you know, expert consensus, but
8  the cut points have been up to ten people, up to 50
9  people, and then gatherings over 50 or over 250.  But
10  in that context, the gathering in a conference room
11  as you just described would be a gathering but not
12  described as a mass gathering.
13    Q.  Would a hundred people at an outdoor auction
14  be a mass gathering?
15    A.  It would be a large gathering.  And I would
16  just -- I would just solve your, your questioning
17  here and just say anything over 250, I would say -- I
18  would call -- classify as a mass gathering in the
19  middle of a pandemic.
20    Q.  And so 250 -- or let's say 300 people at an
21  auction, which is permitted in an outdoor auction,
22  that is a mass gathering; right?
23    A.  I would have to say yes, that that is --
24  that is a type of a mass gathering.
25    Q.  You talked a minute ago about communal and

22 (Pages 85 to 88)

Page 89

1    transitory activities. Is a communal activity --
2    would you say that 300 people at an outdoor auction
3    is a communal activity?
4         MR. DUKE: Objection. Speculation.
5         A. I, I would say that in the context that I
6    was describing it, I would say 300 people coming
7    together is both a mass gathering and, because they
8    are likely to be there for an extended period of
9    time, which is the way I was using communal in, in
10   part was -- that yes, it would be a communal mass
11   gathering.
12        Q. Is 300 people at a -- in a factory floor, is
13   that a mass gathering?
14        MR. DUKE: Objection. Speculation.
15        A. I would say that it is a, a large and a mass
16   gathering by the definition.
17        Q. Okay.
18        A. I would say that in my assessment of these
19   different circumstances though, and you'll recall
20   that I have identified that I'm trying to weigh risks
21   and benefits, we have in our guidance where we've
22   made these exceptions, identified circumstances where
23   we felt they were essential or life-sustaining
24   services.
25        And so for -- obviously I, I can't classify

Page 90

1    an auction as a life-sustaining or essential service,
2    but -- but factories, places generating energy,
3    places providing food and shelter, those would be
4    examples of areas where the counterbalancing human
5    need for the services provided has been a
6    consideration where, you know, under which we have
7    permitted activities we otherwise generally would not
8    have preferred to grant.
9         Q. And so there was a value judgment that those
10   life-sustaining activities needed to go on; correct?
11        MR. DUKE: Objection. Speculation.
12        A. So there was an attempt to weigh those --
13   those particular activities that were necessary that
14   support, you know, essential functions for human --
15   you know, regular human maintenance and survival.
16        Q. Right. When you -- when you say benefits of
17   life-sustaining activities, you're making a value
18   judgment that they need to continue to occur; right?
19        A. Mr. Wiest --
20        MR. DUKE: Objection. I'm going to object
21   to the form of that question.
22        A. Mr. Wiest, I'm going to strive to give you
23   an answer here, but when you say a value judgment,
24   I'm making a weighted risk-benefit analysis for, for
25   where there appear to be benefits that counterbalance

Page 91

1    the risks that are incurred because overall, like
2    I've said, I'm trying to reduce risk as much as
3    possible. And where risk has to be accepted, trying
4    to find instances where, where the reason for
5    accepting it is, is necessary to, you know, human
6    activity.
7         Q. Well, let me use a synonym of value.
8    Another synonym of value is, is something's
9    important.
10        You're determining that something -- that
11   life-sustaining activities are important enough to
12   where they have to continue to occur; right?
13        MR. DUKE: I'm going to -- objection. The
14   witness has, has answered the question.
15        MR. WIEST: He has not answered. If he
16   would, I'd move on.
17        A. Yeah, I would say that they are important
18   activities.
19   BY MR. WIEST:
20        Q. And you've determined that outdoor auctions
21   are important enough to continue to go on, even
22   though there's potentially large crowds and
23   potentially people shouting back and forth; correct?
24        MR. DUKE: Objection. Asked and answered.
25        A. All right. So Mr. Wiest, again, in that

Page 92

1    context I have tried to be as precise as I'm able to,
2    that there are complex analyses. So in that
3    environment, there's the possibility of constraining
4    variables more reliably than there are in other
5    situations.
6         And I -- and I do not purport to say that
7    each of these is without risk, but where we can
8    constrain variables to lower the risk as much as
9    reasonably possible, some of those activities are
10   being permitted as part of the phased reopening of
11   activities, which is, you know, in compliance with
12   the general guidelines outlined nationally.
13        And so those activities, an auction, were
14   not permitted in phase one. And now, as we are in
15   phase two and we enter phase three, those and other
16   activities will be permitted pursuant to certain
17   guidances to try to reduce risk in these increasingly
18   risky environments, outdoor activities being
19   permitted.
20        Q. Doctor, your orders don't ban, say, 50
21   people in a typical office environment from attending
22   a retirement party during working hours; right?
23        MR. DUKE: Objection. Form.
24        A. It, it does not ban that 50 people could get
25   together, to the best of my recollection. But it

23 (Pages 89 to 92)

Page 93

1  places significant restrictions.  So, so common
2  gathering areas, cafeterias, communal areas, all of
3  those areas have been very explicitly in most of
4  these guidances declared to be undesirable, if not
5  strongly discouraged or prohibited.  And people are
6  encouraged to not congregate in any area, you know,
7  within the building.
8       So I -- what I would say is you are correct,
9  we have not explicitly prohibited a gathering of up
10 to 50 people in an office environment, but we have
11 given substantial additional guidance as to how that
12 activity should occur if it is to occur.
13     Q.  Okay.  There would be nothing that would
14 keep you from giving guidance on -- and I know
15 California just did this, I'm not sure if you're
16 aware of it -- on conducting protest activities;
17 right?
18     A.  Mr. Wiest, as we go forward to phase three,
19 in any of these phases it has not -- how to say this,
20 sir.  We are going to -- as long as we don't have a
21 massive resurgence of infection, we are going to
22 permit progressively larger gatherings over time, of
23 which protest is just one form and shape.  And at --
24 those are likely to be included in some future
25 guidance, if not by explicit inclusion then because

Page 94

1  they are part of a general order for how gatherings
2  of a certain size may occur and under what
3  situations.
4       Q.  Let me ask:  Right now, Doctor, the state of
5  affairs is that there's -- there's a ban on
6  gatherings of more than ten people unless it's in
7  some other activity that we've looked at, restaurants
8  perhaps or auctions and things like that; right?
9  That's the current state of affairs?
10     A.  Yes, sir.
11     Q.  When we look at the Capital lawn, the
12 200,000 square feet, if you had to put a number on
13 the number of people if they were to be spread out
14 that could safely gather there -- or maybe not
15 safely, but create a medium or a low risk, what
16 number would you put on it?
17     MR. DUKE:  Objection.  Calls for speculation
18 and I believe we -- I believe this was asked and
19 answered earlier.
20     A.  So Mr. Wiest, I would say you could
21 obviously hold substantially more people in a space
22 like that with, with a six-foot perimeter around all
23 of them.  So obviously that outdoor space could,
24 could hold people standing in their confined space, a
25 great deal many more than could happen in an office

Page 95

1  space or other confined area.
2       Q.  Well, and Doctor, I'm just -- is it -- if
3  you -- if you were looking to a group of protestors
4  that said to you, Doctor, we would like to do this,
5  we recognize this is not a risk-free proposition --
6     MR. DUKE:  Objection to form.
7     Q.  We -- but we want to go and conduct a
8  protest in person at the Capital, tell us how to
9  minimize risk.  We're going to distance, we're going
10 to wear masks.  How many of us would make it a medium
11 or low risk proposition?  What would your answer be?
12     A.  My answer today would be that gatherings of
13 that sort are not permissible until June 29th or
14 later, when we enter phase three, because that has
15 been the general guidance we have given for other
16 gatherings.  Now, after June 29th, as we give
17 additional guidance for some of these larger events,
18 that will help inform how others can, you know,
19 comply with and participate in ways that we are
20 hoping will mitigate risk.
21     But I have said repeatedly throughout our,
22 our meeting this afternoon that all of these
23 gatherings entail risk in the middle of a pandemic.
24 From a public health standpoint, which is the primary
25 lens, you know, that I try to weigh the advice that I

Page 96

1  offer in this, in this pandemic, they are not
2  desirable.  And, and the best we can do is offer
3  guidance for how people can reduce the risk of
4  spreading contagion, and so we will continue to do
5  that.
6       The risks earlier in this -- the, the risk
7  of the disease has not reduced, unfortunately.  But
8  the, the growing knowledge base is helping us
9  hopefully to gain more experience and tailor our
10 recommendations to permit more human activities in a
11 reduced-risk manner.  So we -- it is clearly a very
12 steep learning curve with a pathogen we've never
13 experienced before.
14     Q.  So in terms of -- and I realize, Doctor,
15 that, you know, we're not permitting it today, but in
16 terms of risk reduction, what you could offer today
17 is if, if these people are going to do it anyways and
18 violate the orders, for public health purposes, six
19 feet apart and wearing a mask is your recommendation
20 at this point?
21     MR. DUKE:  Object to form.
22     A.  Well, Mr. Wiest, my -- so my, my scope and
23 my role is public health.  My recommendation is that
24 the activity not occur.
25     Q.  Right.

24 (Pages 93 to 96)

Page 97

```
 1        A.  Others have different responsibilities in
 2   society and will determine, you know, how and when
 3   and where, you know, the activities are enforced or
 4   not.  And there is a lot of inputs that could go into
 5   those decisions.  But for my purposes, I would -- I
 6   continue to recommend that large mass gatherings are
 7   an elevated risk of spreading this infection and that
 8   that is not in the best public health interest both
 9   at the community level or at the individual level.
10        Q.  Okay.  And, and just to be clear, your
11   definition of large mass gatherings is the 250 or
12   more?
13        A.  I'm, I'm using that by reference because
14   that's the federal documents, yes.
15        Q.  Right.  That comes from the CDC; right?  It
16   defines large mass gatherings as 250 or more; right?
17        A.  They've used that in a number of documents.
18        MR. WIEST:  Okay.  Let me just check, I may
19   be done.  Let me just check.  All right.  Doctor, I'm
20   done.
21        THE WITNESS:  Thank you, Mr. Wiest.
22        MR. DUKE:  I have one -- I've got one
23   follow-up, one or two follow-ups, Chris, if you'll
24   let me.  I think just to clear something up, if you
25   don't mind.
```

Page 98

```
 1        MR. WIEST:  Yeah.
 2             REDIRECT EXAMINATION
 3   BY MR. DUKE:
 4        Q.  Dr. Stack, there is a -- there, there have
 5   been certain industries and businesses that have been
 6   designated as critical by the federal government; is
 7   that correct?
 8        A.  There is actually a, an explicit list that
 9   an agency of the federal government has defined and
10   which is referenced in our documents.  I can't
11   remember the agency, but it is -- it is publicly
12   available, that describes essential infrastructure
13   and businesses, yes.
14        Q.  And that list was taken into consideration
15   and played a part in all of our documents?
16        A.  Yes.  I, I personally looked at it, though I
17   can't recall the detail, but I looked at it as part
18   of this.
19        MR. DUKE:  That's all I have.
20             FURTHER CROSS-EXAMINATION
21   BY MR. WIEST:
22        Q.  Doctor, just to clarify, you're talking
23   about the CISA, critical infrastructure sector list?
24        A.  Yes, sir.
25        Q.  Okay.
```

Page 99

```
 1        A.  The, the document and that work product,
 2   yes.
 3        MR. WIEST:  Okay.  That's all I've got.
 4        MR. DUKE:  Thank you all.
 5        MR. WIEST:  Are you reading?  You've got to
 6   tell the court reporter, are you guys going to read?
 7        MR. DUKE:  Pardon?
 8        MR. WIEST:  Are you guys going to read?
 9        MR. DUKE:  No.  We'll --
10        MR. WIEST:  Okay.
11        MR. DUKE:  Video's fine.
12        MR. WIEST:  We're done.
13
14        (Witness excused.)
15        (Deposition concluded at 4:36 p.m.)
16
17
18
19
20   (SIGNATURE WAIVED.)
21   _____         _____
     STEVEN STACK, M.D.            DATE
22
23
24
25
```

Page 100

```
 1             )
     COMMONWEALTH OF KENTUCKY   )
 2             )
 3
 4        I, Lee Ann Goff, Notary Public in and for the
 5   Commonwealth of Kentucky, do hereby certify:
 6        That the witness named in the deposition,
 7   prior to being examined, was by me duly sworn;
 8        That said deposition was taken before me at
 9   the time and place therein set forth and was taken down
10   by me in shorthand and thereafter transcribed into
11   typewriting under my direction and supervision;
12        That said deposition is a true record of the
13   testimony given by the witness and of all objections
14   made at the time of the examination.
15        I further certify that I am neither counsel
16   for nor related to any party to said action, nor in any
17   way interested in the outcome thereof.
18        IN WITNESS WHEREOF I have subscribed my name
19   and affixed my seal this 15th day of June, 2020.
20
21   _____
22        Lee Ann Goff
23        Notary Public 580909
24
25   My Commission Expires:  7/1/21
```

Barlow Reporting & Video Services, LLC
(859) 261-8440