## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## COVINGTON DIVISION

THEODORE JOSEPH ROBERTS, et. al.   :          Case No. 2:20-CV-00054-WOB

    Plaintiffs   :

v.   :

ANDREW BESHEAR, et. al.   :

    Defendants   :

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Plaintiffs, by and through Counsel, provides this opposition to Defendant's Motion to Dismiss.  Rather than repeating every argument set forth in their Motion for Summary Judgment [RE#89], and for purposes of brevity, Plaintiffs reincorporate that Motion in its entirety in response to Defendants' Motion to Dismiss.

## I.    Standard of Review

To survive a motion to dismiss, the plaintiff must allege facts that are sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The reviewing court must accept the factual allegations in the complaint as true and construe the complaint in the light most favorable to the plaintiff. *Hill v. Blue Cross & Blue Shield of Mich.*, 409 F.3d 710, 716 (6th Cir. 2005).

## II.    Law and Argument

### A.  The case is not moot, or an exception applies

The Governor bears a "heavy burden" of establishing that the case is moot and that no exception to mootness applies.  *Harmon v. Holder*, 758 F.3d 728, 732-733 (6th Cir. 2014).

1

Mootness is defeated where a party "suffered, or [is] threatened with, an actual injury traceable to" the Government and if the injury "is likely to be redressed by a favorable judicial decision." *Id.*

    1.  <u>The case is not moot where the Plaintiffs actually violated challenged orders and still face potential prosecution for such violations.</u>

Violations of the Governor's orders are (or at least were, at the time) Class A misdemeanors.  K.R.S. 39A.990.  The statute of limitations of two years has not yet passed. K.R.S. 500.050.  Moreover, Kentucky law allows for prosecution regardless of whether the order was rescinded.  K.R.S. 446.110 ("No new law shall be construed to repeal a former law as to any offense committed against a former law, nor as to any act done … or in any way whatever to affect any such offense or act so committed or done …").  *See, also, Rodgers v. Commonwealth*, 285 S.W.3d 740, 750-752 (Ky. 2009).

The Governor directed the Kentucky State Police to place notices on each of the Plaintiffs' windshields following their attendance at Easter Sunday church in April, 2020. [Declaration Roberts, RE#7-2, PageID#150-155; Verified Amended Complaint, RE#6].  A review of the language of those notices is important: the notices in question informed the Plaintiffs that the occupants of the vehicle were present at a mass gathering prohibited by the Governor's orders.  *Id.*  It further indicated government authorities, e.g. the Kentucky State Police, recorded the Plaintiffs' license plates.  *Id.*  And, it informed the Plaintiffs that they committed Class A misdemeanors.  *Id.*

At ***<u>no time</u>*** has the Governor, or any other state government official, ***<u>ever</u>*** sent Plaintiffs any notice rescinding or otherwise disclaiming this intention to prosecute, and Mr. Roberts has a reasonable and actual belief that he may be prosecuted.  [Second Declaration of Theodore

Roberts, RE#89-1].  As it is almost a year later, if the Defendants were not going to prosecute, it would have been an easy matter for them to say so by now.

Thus, because an injunction would protect these plaintiffs from prosecution, the matter is not moot.  *Sacks v. Office of Foreign Assets Control*, 466 F.3d 764 (9th Cir. 2006) (violation of repealed statute does not foreclose relief if the statute was violated); *Bowman v. Schwarzenegger*, 2009 U.S. Dist. LEXIS 24678 (ED Cal 2009) (same); *Dean Foods Co. v. Tracy*, 990 F. Supp. 646 (W.D. Wis. 1997) (claim not moot where enforcement possible); *Bennie v. Munn*, 822 F.3d 392 (8th Cir. 2016) (same); *Ctr. for Individual Freedom v. Tennant*, 706 F.3d 270, 293 (4ᵗʰ Cir. 2013) (possibility of enforcement for past violation rendered matter not moot).

Having been threatened with prosecution, and a credible threat at that, Plaintiffs have standing and the temporary withdrawal of the order does not change that fact.  And, what is more, Mr. Roberts' own declaration indicates that he traveled under the protections offered by this Court's injunction on the travel ban, while that ban was in effect.

> 2.  <u>The case is not moot where the capable of repetition yet evading review exception applies.</u>

Governor Beshear also fails to meet his burden to demonstrate that this case is not one that fits the exception to mootness, i.e., it is capable of repetition, yet evading review.

"The exception applies where '(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again.'" *Fed. Election Comm'n v. Wisconsin Right To Life, Inc.*, 551 U.S. 449, 462 (2007).  Both requirements are present in this case.

Given the rapidly changing COVID-19 landscape there is no question that the duration of the Governor's bans on mass gatherings and travel were always going to be "too short to be fully

litigated prior to cessation or expiration."  Beyond COVID, the unconstitutional bans were always going to be far too short in duration to be fully litigated while they were in effect. This sort of case always was destined to be too short to be fully litigated. *See Kingdomware Tech., Inc. v. United States*, 136 S. Ct. 1969, 1976 (2016) (two years is too short); *Turner v. Rogers*, 564 U.S. 431, 440 (2011) (12 months is too short); *First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 774 (1978) (18 months is too short); *Southern Pac. Terminal Co. v. ICC*, 219 U.S. 498, 515 (1911) (two years is too short); *Roe v. Wade*, 93 S. Ct. 705 (1973) (266 days is too short).

Because COVID-19 has already shown that it can experience a resurgence after a decline, it is entirely reasonable to assume an additional wave of cases.  As a result, it is reasonable to assume these unconstitutional bans may be repeated where the Governor, at no time, has completely banned *all* comparable activities as a response to COVID-19.  Instead, he has promulgated executive orders that have significantly impacted the free exercise of religion while leaving unaffected similar, but purely secular, activities involving a like risk of COVID-19 transmission.  This includes the order challenged here, and the order closing parochial schools, which was challenged in *Pleasant View Baptist Church, et. al. v. Beshear*, EDKY 2:20-cv-00166 (EDKY 2020).

Thus, and as demonstrated, this case is one that is capable of repetition yet evading review.  *See, also, Bols v. Newsom*, 2020 U.S. Dist. LEXIS 115143, fn5 (SDCA 2020) (noting that case was capable of repetition yet evading review where Governor Newsome could reimpose COVID-19 orders); *Big Tyme Invs., L.L.C. v. Edwards*, 2021 U.S. App. LEXIS 928, fn.9 (5th Cir. 2021) (distinguishing *Spell v. Edwards*, 962 F.3d 175, 179 (5th Cir. 2020) on the basis that, in *Edwards*, the Court was dealing with a COVID-19 order that was taken on and off, versus simply expiring as was the operative factor in *Spell*); *Plaza Motors of Brooklyn, Inc. v.*

4

*Cuomo*, 2021 U.S. Dist. LEXIS 12726, n.1 (EDNY 2021) (determining the matter was capable of repetition yet evading review where there was the possibility the restrictions could be reimposed); *cf. Pleasant View Baptist Church v. Saddler*, 2020 U.S. Dist. LEXIS 233261 (6th Cir. 2020) (adhering to *Spell* because the orders in that case, unlike those here, expired by their own terms).

Here, neither the travel ban nor the ban on worship expired, as was the case in both *Spell*, and *Pleasant View*. Instead, the Governor withdrew these challenged orders, at least for the time being. And that fact is determinative when it comes to a capable of repetition yet evading review analysis, as the Fifth Circuit explained in *Edwards*, when it distinguished its own decision in *Spell*.

Thankfully for Plaintiffs, this Court does not judge this issue in a vacuum. As the Sixth Circuit observed in the appeal in this very case, the Governor continues to file pleadings indicating his desire to be able to re-impose the ban. *Maryville Baptist Church, Inc. v. Beshear*, 977 F.3d 561, 565-566 (6th Cir. 2020). Recently, the Governor again indicated, in his Motion to Dismiss, his desire to reimpose these bans should the need arise, arguing that he "should be afforded broad latitude to craft temporary emergency public health measures to respond to COVID-19." [PageID#1237]. The Governor then goes to great lengths to defend his unconstitutional bans. [PageID#1229-1238]. This underscores, rather than alleviates, concerns that such restrictions may be reimposed.

Meanwhile, on February 2, 2021, the Kentucky General Assembly enacted legislation, over the Governor's veto, that substantially changed the Governor's powers to enact executive orders, via 2021 RS SB1.[1] And the Governor immediately filed suit to attempt to retain the

---

[1] https://apps.legislature.ky.gov/record/21rs/sb1.html (last visited 2/3/2021).

5

ability to enact executive orders including arguing that he needed the ability to issue orders that again violate fundamental rights.[2] This again demonstrates that the case is not moot.

      3.  <u>The case is not moot where the voluntary cessation exception applies.</u>

There is, as explained in the Complaint and in our Motion for Summary Judgment [RE#89], no doubt that the Governor had the offending notices placed on vehicles by the Kentucky State Police, vigorously engaged in litigation defending his orders and his threatened enforcement, and then, only after adverse decisions were entered, lifted his orders. Later, the Governor filed pleadings attempting to lift injunctions entered against him and indicated his intention to reimpose his very same orders. <u>At no time</u> has the Governor <u>ever</u> said he would not re-instate his orders; instead, the Governor has attempted undo any constraints on his ability to re-enact restrictions, while simultaneously arguing that he needs the flexibility to re-enact restrictions.

"A defendant's voluntary cessation of allegedly unlawful conduct ordinarily **does not suffice to moot a case**." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). (emphasis added). "If it did, the courts would be compelled to leave 'the defendant . . . free to return to his old ways.'" *Id., citing City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982).

As the United States Supreme Court observed:

> We have recognized, however, that a defendant cannot automatically moot a case simply by ending its unlawful conduct once sued. Otherwise, a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends.

---

[2] https://governor.ky.gov/attachments/202010202_Filed-Pleadings.pdf (last visited 2/3/2021) (arguing that the Governor needs the ability to enact orders to again infringe on fundamental rights at ¶¶ 33-50, 91, 113-114, 127, 128, 159-160, 184).

Given this concern, our cases have explained that a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.

*Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013).

In *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 n.1 (2017), the Supreme Court held that a governor's change in policy does not moot a case. Rather, the court held that ***the defendant*** has the formidable burden to demonstrate that it is "absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc.*, 528 U.S. 167 at 190.

In this case, Governor Beshear has failed to meet his "formidable" burden that it is "absolutely clear" he will not reimpose these unconstitutional edicts. His mere lifting of these edicts, for the time being, but with his record of intending to reimpose those edicts if needed, does not come close to meeting **his heightened burden** to prove mootness. Governor Beshear has "neither asserted nor demonstrated that [he] will never resume the complained of conduct." *Norman-Bloodsaw v. Lawrence Berkely Lab.*, 135 F.3d 1260, 1274 (9th Cir 1998); *Cf. United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1537 n.* (2018) (holding "the rescission of the policy does not render this case moot").

Here, the Governor "has not carried the 'heavy burden' of making 'absolutely clear' that [he] could not revert to [his] policy," *id.*, of imposing unique and discriminatory numerical limits and restrictions on religious worship services, because his sudden change in policy is neither permanent nor irrevocable. *See City of L.A. v. Lyons*, 461 U.S. 95, 101 (1983). The overall Healthy at Work plan, and the specific but evolving Guidelines for Places of Worship (the first version of which was issued only **after the Governor was preliminarily enjoined from enforcing his unconstitutional restrictions against Plaintiffs**), "by [their] terms [are] not

7

permanent" and have not "'**irrevocably** eradicated the effects of the alleged violation.'" *Lyons*, 461 U.S. at 101 (emphasis added). Neither the plain language nor the regulatory context of the Governor's Orders and Guidelines demonstrate any authority to bind the Governor irrevocably, or any durability against his fiat. *See Lyons*, 461 U.S. at 101; *Porter v. Bowen*, 496 F.3d 1009, 1017 (9th Cir. 2007).

In fact, just the opposite is true. As the May 9 Order demonstrates, "[t]he Cabinet for Health and Family Services will monitor these directives continuously" and continue to "provide updates" throughout the COVID-19 situation. (RE#58-2) Moreover, the Governor's website that is constantly updating the requirements and restrictions on gatherings explicitly states:

> **Reminder: People should be prepared for state and local public health orders to be extended, amended, or changed as needed to protect public health. This means we may move between the different Phases during this pandemic.**

*See* Healthy at Work: Reopening Kentucky, *available at* https://govstatus.egov.com/ky-healthyat-work (last visited Jan. 28, 2021). Thus, not only is the Governor **not** contending that the change (brought about by numerous courts preliminarily prohibiting him from enforcing his gathering restrictions) is permanent, but he is **explicitly stating that previous restrictions may need to be reinstated, purportedly based on health metrics**.

Importantly, the Governor has "neither asserted nor demonstrated that [he] will **never** resume the complained of conduct." *Norman-Bloodsaw v. Lawrence Berkely Lab.*, 135 F.3d 1260, 1274 (9th Cir 1998) (emphasis added). Rather, the Governor has laid the groundwork for imposing more, not fewer restrictions going forward. Indeed, he has already reversed course several times, and has stated publicly, and unequivocally, that he is willing "to do what's necessary" (in his unchecked discretion) to "deal[] with a surge in the coronavirus."

Since the Governor's decision not to extend his recent orders is by executive order, and is not statutorily binding, Governor Beshear's own actions cannot moot the claim. This is because determining whether the ceased action "could not reasonably be expected to recur," *Friends of the Earth*, 528 U.S. at 189, requires taking into account the totality of the circumstances surrounding the voluntary cessation, including the manner in which the cessation was executed. *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 767 (6th Cir. 2019). Where, as here, "a change is merely regulatory [or by executive action], the degree of solicitude the voluntary cessation enjoys is based on whether the regulatory processes leading to the change involved legislative-like procedures or were ad hoc, discretionary, and easily reversible actions." *Id.*

Thus, where, as here, "the discretion to effect the change lies with one agency or individual, or there are no formal processes required to effect the change, significantly more than the bare solicitude itself is necessary to show that the voluntary cessation moots the claim." *Id.*

Given the Governor's repeated attempts to lift the injunction through court actions, which would allow him the ability to reimpose his unconstitutional bans, particularly in light of the temporary recission or expiration of his bans occurring in the midst of litigation, his "bare solicitude" here is entitled to no weight whatsoever. *See A. Philip Randolph Inst. v. Husted*, 838 F.3d 699, 713 (6th Cir. 2016), *rev'd on other grounds*, 138 S. Ct. 1833 (2018) ("[T]he circumstances of the Secretary's issuance of the new form do not inspire confidence in his assurances regarding the likelihood of recurrence—he issued that new form on the same day as the parties' final merits briefs were due before the district court, attaching the form as an exhibit to his brief and only then presenting his mootness argument. This fact makes the Secretary's voluntary cessation appear less genuine."); *Northland Family Planning Clinic, Inc. v. Cox*, 487 F.3d 323, 342-43 (6th Cir. 2007) ("In this case, that burden is increased by the fact that the

9

voluntary cessation only appears to have occurred in response to the present litigation, which shows a greater likelihood that it could be resumed.").

This litigation-induced timing, combined with the drastic micromanagement of worship imposed by the ambiguously mandatory Guidelines, betrays an intent to go back. *Cf. Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012) ("Such [post-litigation] maneuvers designed to insulate a decision from review by this Court must be viewed with a critical eye."); *McCreary County, Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 871 (2005) (rejecting counties' mere "litigating position" as evidence of actual intent of county policies).

Further, where, as here, the Governor "vigorously defends the constitutionality of [his] . . . program" is important to the mootness inquiry. *Schlissel*, 939 F.3d 756 at 770, *citing Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007).  **Nothing** Governor Beshear has said or done has shown that he believes he was wrong to impose his unconstitutional bans and Governor Beshear continues to publicly defend his bans.  A case is not moot where, as here, the Governor "did not voluntarily cease the challenged activity because he felt [it] was improper," and "has at all times continued to argue vigorously that his actions were lawful." *Olagues v. Russoniello*, 770 F.2d 791, 795 (9th Cir. 1985).

The Supreme Court has noted that in addition to a court retaining the ability to hear a case after voluntarily cessation (considerations of mootness), "the court's power to grant injunctive relief survives discontinuance of the illegal conduct." *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953). "The necessary determination is that there exists some cognizable danger of recurrent violation…." *Id.*  The Governor's attempts to lift the injunction regarding in-

person church attendance in the *Maryville* case, and his attempts in this case to lift the travel ban, proves "some cognizable danger of recurrent violation." *Id.*

As the Supreme Court recently acknowledged in *Roman Catholic Diocese v. Cuomo*, 208 L. Ed. 2d 206 (2020), the threat of reimposing the restrictions and the short time periods involved warranted granting relief. *Id.* at 210 ("injunctive relief is still called for because the applicants remain under a constant threat that [the restrictions will be reimposed]," [t]he Governor imposed restrictions "without prior notice" and the challengers "have made the showing needed to obtain relief, and there is no reason why they should bear the risk of suffering further irreparable harm in the event [the restrictions are reimposed].").

Failing to take up this matter would permit Governor Beshear to "engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends." *Nike, Inc.*, 568 U.S. 85, 91. Thus, the Sixth Circuit has indicated the propriety of proceeding to the merits in such situations. *Anderson v. Spear*, 356 F.3d 651, 656 (6th Cir. 2004) (mere temporary ceasing of challenged activity does not warrant withholding relief); *Schlissel*, 939 F.3d 756 at 770.

This concept was discussed in *Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341 (7th Cir. 2020), where the Seventh Circuit appropriately found the voluntary cessation doctrine applied to orders that, such as those here, did not expire on the orders' own terms. And, federal courts have, except in instances where orders have expired by their own terms, routinely found the voluntary cessation exception to apply. *See, also, Legacy Church, Inc. v. Kunkel*, 2020 U.S. Dist. LEXIS 122542 (D.N.M. 2020) (voluntary cessation applied to Governor's expired orders on church bans that were rescinded but could be reinstated); *Antietam Battlefield KOA v. Hogan*, 461 F. Supp. 3d 214 (D. Md. 2020) (same); *Cty. of Butler v. Wolf*, 2020 U.S. Dist.

LEXIS 167544 (PAWD 2020) (same); *Bols v. Newsom*, 2020 U.S. Dist. LEXIS 115143 (SD Cal. 2020); *Vill. of Orland Park v. Pritzker*, 2020 U.S. Dist. LEXIS 136833, n.2 (Il.N.D. 2020); *Dark Storm Indus. Llc v. Cuomo*, 2020 U.S. Dist. LEXIS 120514 (NYND 2020); *Prof'l Beauty Fed'n. of Cal. v. Newsom*, 2020 U.S. Dist. LEXIS 102019 (CACD 2020) (finding voluntary cessation because "[a]lthough the State has permitted comities to advance through Stage 2 more quickly, the State is not constrained from later reenacting the harsh restrictions which existed at the beginning of this pandemic"); *Paradise Concepts, Inc. v. Wolf*, 2020 U.S. Dist. LEXIS 157250, n.1 (EDPA 2020) (finding that voluntary cessation applied).

### B. The Plaintiffs adequately plead a Free Exercise Case

The disposition of the Free Exercise challenge was discussed and, indeed, largely decided by the Sixth Circuit in *Roberts v. Neace*, 958 F.3d 409 (6th Cir. 2020).  As the Court discussed in that case, "[t]he Governor's restriction on in-person worship services … " prohibits the free exercise" of "religion" in violation of the First and Fourteenth Amendments." *Id.* at 413, citing U.S. Const. amends. I, XIV; *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).  As that Court explained, "[o]n one side of the line, a generally applicable law that incidentally burdens religious practices usually will be upheld."  *Id., citing Employment Div. v. Smith*, 494 U.S. 872, 878-79 (1990).  "On the other side of the line, a law that discriminates against religious practices usually will be invalidated because it is the rare law that can be 'justified by a compelling interest and is narrowly tailored to advance that interest.'" *Id., citing Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 553 (1993).

"These orders … fall on the prohibited side of the line." *Id.*  "Faith-based discrimination can come in many forms." *Id.*  "A law might be motivated by animus toward people of faith in general or one faith in particular." *Id.*  "Or a law might appear to be generally applicable on the

surface but not be so in practice due to exceptions for comparable secular activities." *Id., citing Ward v. Polite*, 667 F.3d 727, 738 (6th Cir. 2012); *see also Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 365-67 (3d Cir. 1999).

The Sixth Circuit observed in *Roberts* that "we don't think it's fair at this point and on this record to say that the orders or their manner of enforcement turned on faith-based animus." *Id.* at 413. But, the record at this point in time is clearly different. Now, the record contains the State Treasurer's report, which paints a stark picture of faith-based animus. It tells a story of specific church enforcement protocols being adopted, of state police being directed to churches and not elsewhere, of knowledge of First Amendment violations followed by the deliberate choice to proceed anyways. (Declaration Wiest, Exhibit 1, RE#89-1, attached to Plaintiffs' Motion for Summary Judgment).[3] That, of course, under *Lukimi* and *Masterpiece Cakeshop v. Colorado Civil Rights Commission*, 138 S. Ct. 1719 (2018), is more than sufficient to prove a violation of the Free Exercise Clause.

And, as the Sixth Circuit explained in *Roberts*, "the four pages of exceptions in the orders, and the kinds of group activities allowed, remove[d] them from the safe harbor for generally applicable laws." *Id.* at 413. "As a rule of thumb, the more exceptions to a prohibition, the less likely it will count as a generally applicable, non-discriminatory law." *Id., citing Ward*, 667 F.3d at 738. "At some point, an exception-ridden policy takes on the appearance and reality of a system of individualized exemptions, the antithesis of a neutral and

---

[3] Because the Report is a public record, and contains public records documenting governmental operations contemporaneously with the time they occurred, they are subject to judicial notice. It is available from government websites: https://apps.legislature.ky.gov/CommitteeDocuments/8/12872/Oct%2022%202020%20Treasurer 's%20Report%20Ball.pdf (last visited 12/30/2020). *Twumasi-Ankrah v. Checkr, Inc.*, 954 F.3d 938 (6th Cir. 2020); *Bailey v. City of Ann Arbor*, 860 F.3d 382 (6th Cir. 2017).

generally applicable policy and just the kind of state action that must run the gauntlet of strict scrutiny." *Id.* at 413, *citing Ward*, 667 F.3d at 740.  Further, "many of the serial exemptions for secular activities pose comparable public health risks to worship services."  *Id.* at 414.

"The Governor has offered no good reason for refusing to trust the congregants who promise to use care in worship in just the same way it trusts accountants, lawyers, and laundromat workers to do the same."  *Id.*   In fact:

> Come to think of it, aren't the two groups of people often the same people—going to work on one day and going to worship on another? How can the same person be trusted to comply with social-distancing and other health guidelines in secular settings but not be trusted to do the same in religious settings? The distinction defies explanation, or at least the Governor has not provided one.  *Id.*

> Further:

> But restrictions inexplicably applied to one group and exempted from another do little to further these goals and do much to burden religious freedom. Assuming all of the same precautions are taken, why can someone safely walk down a grocery store aisle but not a pew? And why can someone safely interact with a brave deliverywoman but not with a stoic minister? The Commonwealth has no good answers.  *Id.* at 414.

Thus, "[w]hile the law may take periodic naps during a pandemic, we will not let it sleep through one."  *Id.* at 414-415.  "All of this requires the orders to satisfy the strictures of strict scrutiny."  *Id.* at 415.  "They cannot."  *Id.*  "All in all, the Governor did not customize his orders to the least restrictive way of dealing with the problem at hand."  *Id.* at 416.

There are two additional cases that are applicable: one from the United States Supreme Court and one from the Sixth Circuit.  The Supreme Court case first.  In *Roman Catholic Diocese v. Cuomo*, 208 L. Ed. 2d 206 (2020), the Supreme Court analyzed a less burdensome restriction than the one imposed by Governor Beshear earlier this year.  As in *Cuomo*, statements by Governor Beshear, and the myriad of evidence contained in the Treasurer's report, are "statements made in connection with the challenged rules [that] can be viewed as targeting," triggering strict scrutiny.  *Id.* at 208.  "But even if we put those comments aside, the regulations

cannot be viewed as neutral because they single out houses of worship for especially harsh treatment." *Id.*

This was because "while a synagogue or church may not admit more than 10 persons, businesses categorized as 'essential' may admit as many people as they wish." *Id.* "These categorizations lead to troubling results." *Id.* "At the hearing in the District Court, a health department official testified about a large store in Brooklyn that could 'literally have hundreds of people shopping there on any given day.'" *Id.* at 208-209. "Yet a nearby church or synagogue would be prohibited from allowing more than 10 or 25 people inside for a worship service." *Id.* at 209.

The Supreme Court determined that these disparities led to a finding that the law was neither neutral nor generally applicable, triggering strict scrutiny. *Id.* And the Court found, just as the Sixth Circuit did in *Roberts*, that the orders failed to meet those stringent requirements and was unconstitutional. *Id.*

Which brings us to the third and most recent case: *Monclova Christian Acad. v. Toledo-Lucas County Health Dep't*, 2020 U.S. App. LEXIS 40856, --- F.3d --- (6th Cir. 2020). *Monclova* likewise dealt with COVID-19 closure orders and a Free Exercise challenge. *Id.* Citing Cuomo, the Sixth Circuit observed that the Free Exercise Clause "prohibits government officials from treating religious exercises worse than comparable secular activities[.]" *Id.* The *Monclova* Court observed that "[w]hether conduct is analogous (or 'comparable') for purposes of this rule does not depend on whether the religious and secular conduct involve similar forms of activity." *Id.* "Instead, comparability is measured against the interests the State offers in support of its restrictions on conduct." *Id.* "Specifically, comparability depends on whether the secular

conduct 'endangers these interests in a similar or greater degree than' the religious conduct does." *Id.*

Analyzing *Cuomo*, the Sixth Circuit observed that "[m]itigation of that risk, of course, was the State's asserted interest in support of its restrictions on attendance at religious services [in *Cuomo*]; the State did not extend those restrictions to comparable secular conduct; and thus, the [Supreme] Court held, 'the challenged restrictions' were not 'of 'general applicability[.]'" *Id.* From a mitigation of risk perspective, in-person church attendance did not threaten the public in any greater degree than did sitting in close proximity in an office, an airport, or bus station. Thus, the ban was unconstitutional.

As in *Roberts*, *Cuomo*, and *Monclova*, the unconstitutional ban by the Governor on in-person attendance at religious services does not survive strict scrutiny and, therefore, violates the free exercise clause. *Id.* Summary judgment for the Plaintiffs is appropriate and a permanent injunction should enter.

In response, the Governor argues that the Injunction Pending Appeal concurrence by a single Justice – Chief Justice Roberts -- in *S. Bay United Pentecostal Church v. Newsom*, 590 U. S. ___, 140 S. Ct. 1613 (2020), means he wins and that he is entitled to almost absolute deference. Not surprisingly, two other Justices made a number of observations about the precedential value of that single justice concurrence in *Cuomo*, 208 L. Ed. 2d 206, 212 (Gorsuch and Kavanaugh, concurring).

First, they observed that *South Bay* relied on *Jacobson v. Massachusetts*, 197 U. S. 11 (1905), but also observed that *Jacobson* involved "an entirely different mode of analysis, an entirely different right, and an entirely different kind of restriction," and thus was inapposite and distinguishable. 208 L. Ed. 2d at 212. That concurrence appropriately observed that "we may

not shelter in place when the Constitution is under attack" and "[t]hings never go well when we do." *Id.* at 214.

But even Chief Justice Roberts himself, in *Cuomo*, observed that "[n]umerical capacity limits of 10 and 25 people, depending on the applicable zone, do seem unduly restrictive" and were thus "distinguishable from those we considered in *S. Bay United Pentecostal Church v. Newsom*, 590 U. S. ___, 140 S. Ct. 1613, 207 L. Ed. 2d 154 (2020)." *Id.* at 218. Here, of course, we dealt with an absolute prohibition on in-person worship, not merely a numerical or percentage capacity restriction.

The Chief Justice finally concluded that Justice Gorsuch was reading too much into *South Bay* when he read it to mean that Chief Justice Roberts was arguing for a deference of the sort the Governor argues must be applied here – and the Chief Justice was clear that his *South Bay* concurrence meant no such thing. *Id.* at 219.

Two final observations on the Governor's deference argument: first, he made the same argument to the Sixth Circuit in this case, and the Sixth Circuit, in response, observed that the decision in *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610 (6th Cir. 2020) and *Roberts v. Neace*, 958 F.3d 409 (6th Cir. 2020) were "each premised on legal assessments of the claimants' free exercise rights **and each still binding in the circuit**." 977 F.3d 561, 563. In other words, the Sixth Circuit did not believe the result, or analysis, changed merely because of the single Justice concurrence in *South Bay*.

Which leads to the second observation: Judge Van Tatenhove had the opportunity to address this same argument in *Ramsek v. Beshear*, 468 F. Supp. 3d 904 (EDKY 2020). There, the Court found "significant the procedural context in which the Supreme Court acted," and made other observations (applicable here) that it did not create precedent. *Id.* at 912-914.

Again, the Plaintiffs have stated a Free Exercise Claim.

**C.  The Plaintiffs adequately plead a violation of the Right to Travel**

Under binding Supreme Court precedent, the "constitutional right to travel from one State to another" is firmly embedded in this nation's constitutional jurisprudence. *Saenz v. Roe*, 526 U.S. 489, 498 (1999) (citing *U.S. v. Guest*, 383 U.S. 747, 757 (1966)). "The right is so important that it is assertable against private interference as well as governmental action… a virtually unconditional personal right, guaranteed by the Constitution to us all." *Id*. (citing *Shapiro v. Thompson*, 394 U.S. 618, 643 (1969) (Stewart, J. concurring)). "Freedom of movement is basic in our scheme of values." *Id*. (citing *Crandall v. Nevada*, 6. Wall 35, 44 (1868); *Williams v. Fear*, 179 U.S. 270, 274 (1900); *Edwards v. California*, 314 U.S. 160 (1941)).  The Court wrote in the 1970s that "the right of interstate travel is virtually unqualified." *Califano v. Aznavorian*, 439 U.S. 170, 176 (1978).

Decades earlier, the Supreme Court in *Kent v. Dulles*, 357 U.S. 116, 125 (1958), was confronted with the constitutional issue involving travel during what was the then emergency of the day: the threat posed by communists. The Secretary of State refused to issue passports to two individuals after questions arose as to whether they were communists.  The United States was involved in a Cold War with the Soviet Union at the time.  However, and even in the midst of the crisis of the Cold War, the Supreme Court reversed.  It held that the right to travel is a part of the liberty of which the citizen cannot be deprived without due process of law under the Fifth Amendment.  This is because freedom of movement "may be as close to the heart of the individual as the choice of what he eats, or wears, or reads." *Id*. at 126.  The Court contrasted the right of interstate travel

18

with the right of international travel, holding that while **interstate travel was a virtually unqualified right**, the right of international travel could be regulated within the bounds of due process. *Id.*

In his Motion, the Governor cites an international travel case, *Zemel v. Rusk*, 381 U.S. 1, 15 (1965) (and other cases dealing with international travel). But, as noted, in *Kent*, 357 U.S. 116, 126, the Court correctly observed that international travel was different – and not a fundamental right -- and thus, analyzed differently.

The Governor also argues, in defiance of any logic, that the threat posed by COVID-19 gives him carte blanche to lock down an entire state from traveling over its border with another state for months at a time, even where the prohibited manner of doing so is wholly divorced from any real risk of transmitting disease (how, for instance, a person traveling by car from Campbell County, across the bridge, and back to Kenton County, without coming into contact with a single other person, raises any risk is not explained). Of course, for his part, Dr. Stack testified that persons who remain in automobiles are highly unlikely to contract any disease. [Depo. Stack, RE#84, p. 42, PageID#1051].

Other Supreme Court caselaw refutes the Governor's claim to unlimited power. *Griffin v. Breckenridge*, 403 U.S. 88, 105-06 (1971) was decided in the wake of ongoing racial violence. In *Griffin*, black citizens of Mississippi sued a group of whites who conspired to assault them while they travelled on the highways. There, the Court held that "[o]ur cases have firmly established that the right of interstate travel is constitutionally protected, does not necessarily rest on the Fourteenth Amendment, and is assertable against private, as well as governmental, interference." *Id.*

19

History shows the Supreme Court has been consistent on the right to interstate travel.  In all of these cases, during all of these similarly trying times, Chief Justice Taney's words from his opinion in the Passenger Cases still ring true: "For all the great purposes for which the Federal government was formed, we are one people, with one common country.  We are all citizens of the United States; and, as members of the same community, must have the right to pass and repass through every part of it without interruption, as freely as in our own States." *Smith v. Turner*, 48 U.S. 283, 492 (1849) (Taney, C.J., dissenting).

This Court appropriately analyzed the travel ban in *Roberts v. Neace*, 457 F. Supp. 3d 595 (EDKY 2020).  It appropriately raised a number of troubling questions, none of which had answers then, and none of which have answers now.  *Id.* at 602-603.  And, as this Court observed, the ban was not narrowly tailored.  *Id.* at 603.

Finally, the Governor argues he is entitled to deference to such a degree so as to eliminate the right at issue.  But, as noted in *Cuomo*, 208 L. Ed. 2d 206, *Maryville Baptist Church, Inc.*, 957 F.3d 610 and *Roberts*, 958 F.3d 409, the Governor is simply wrong.  As explained in *Maryville II*, those cases, which demonstrate that the constitutional rights and analysis is conducted without deference, are "**each still binding in the circuit**."  977 F.3d 561, 563.

The Governor's Travel Ban violated a fundamental right under the federal constitution.  And the ban was not narrowly tailored to serve a compelling governmental interest.  The claims regarding the travel ban should not be dismissed.

### D.  Vacatur is not appropriate here where, if the case is moot, it is due to the actions of the Defendants

The Governor finishes by arguing that this Court should vacate the existing preliminary injunction on the travel ban.  But, it is undisputed Governor Beshear's **own voluntary actions** by rescinding that order, and not happenstance and not the actions of these Plaintiffs have given rise to the current situation.  Thus, the injunction should not be vacated.  "Vacatur is in order when mootness occurs through happenstance -- circumstances **not attributable** to the parties -- or, relevant here, the 'unilateral action of the party who prevailed in the lower court.'" *Arizonans for Official English v. Ariz.*, 520 U.S. 43, 71-72 (1997).  "The principal condition to which we have looked is whether the party seeking relief from the judgment below caused the mootness by voluntary action."  *United States Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 24 (1994).  As the Supreme Court explained in *Bonner*, the denial of vacatur to a litigant whose own actions rendered the case moot is merely one application of the principle that '[a] suitor's conduct in relation to the matter at hand may disentitle him to the relief he seeks,'" *quoting Sanders v. United States*, 373 U.S. 1, 17 (1963).

In fact, both the Supreme Court and the Sixth Circuit have been clear that vacatur is not appropriate here because the Governor caused the situation.  *Friends of the Earth, Inc.*, 528 U.S. 167, 194, n.6; *Remus Joint Venture v. McAnally*, 116 F.3d 180 (6th Cir. 1997), *quoting Scott v. Iron Workers Local 118, Int'l Ass'n of Bridge Workers*, 928 F.2d 863, 865 (9th Cir. 1991) ("An appellate court should not vacate a lower court opinion in a moot case in the narrow situation in which the appellant, having lost in the court below and desiring to avoid the collateral estoppel effects of the lower court decision, causes his appeal to become moot.") and *Wisconsin v. Baker*, 698 F.2d 1323, 1331 (7th Cir.), *cert. denied*, 463 U.S. 1207, 77 L. Ed. 2d 1388, 103 S. Ct. 3537 (1983) ("Just as winning litigants may not bolster the preclusive effect of final judgments by

deliberately mooting questions on appeal, so losing litigants may not destroy their preclusive effect by adopting the same ploy.").

In *Ctr. for Individual Freedom v. Tennant*, 706 F.3d 270, 293 (4th Cir. 2013), the Fourth Circuit addressed a case where, as here, there was a preliminary injunction that was violated by the Plaintiffs in a constitutional case.  The District Court, rather than vacating that order, and because the Plaintiffs had violated it, instead dissolved it, which had the legal effect of continuing to protect the Plaintiffs from prosecution for their violations of it during the litigation. This Court should consider a similar outcome here.

Vacating the preliminary injunction, versus merely dissolving it, has the effect of exposing the Plaintiffs to prosecution for crossing state lines at a time when the Governor's orders were in effect.  It would be unjust to do so.

III.   **Conclusion**

The Governor's Motion to Dismiss should be denied.

Respectfully submitted,

/s/ Christopher Wiest_____
Christopher Wiest (KBA 90725)
Chris Wiest, Atty at Law, PLLC
25 Town Center Blvd, Suite 104
Crestview Hills, KY 41017
859/486-6850 (v)
513/257-1895 (c)
859/495-0803 (f)
chris@cwiestlaw.com

/s/Thomas Bruns_____
Thomas Bruns (KBA 84985)
4750 Ashwood Drive, STE 200
Cincinnati, OH 45241
tbruns@bcvalaw.com
513-312-9890

/s/Robert A. Winter, Jr. _____
Robert A. Winter, Jr. (KBA #78230)
P.O. Box 175883
Fort Mitchell, KY 41017-5883
(859) 250-3337
robertawinterjr@gmail.com
**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

I certify that I have served a copy of the foregoing upon Counsel for the Defendants, this 8th day of February, 2021, by filing same with the Court's CM/ECF system which gives notice to all counsel of record.

/s/ Christopher Wiest _____
Christopher Wiest (KBA 90725)

23